2007 WY 167

**Aaron FLOOD, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

**Nos. 06–126, 06–127.**

Supreme Court of Wyoming.

Oct. 23, 2007.

540

Representing Appellant: D. Terry Rogers, Interim State Public Defender, PDP; Donna D. Domonkos, Appellate Counsel; Ryan R.

Roden, Senior Assistant Appellate Counsel; Kirk Morgan, Assistant Appellate Counsel. Argument by Mr. Morgan.

Representing Appellee: Patrick J. Crank, Attorney General; Terry L. Armitage, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Eric A. Johnson, Faculty Director, PAP; Geoff Gunnerson, Student Director, PAP; Scott L. Mullins, Student Intern, PAP. Argument by Mr. Mullins.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.

KITE, Justice.

[¶ 1] After conditionally pleading guilty to two controlled substances offenses, Mr. Flood challenges the district court's denial of his motion to suppress evidence discovered during a search of the vehicle he was driving. He maintains that he was detained in violation of his constitutional rights. Concluding the highway patrol trooper did not exceed the scope of permissible detention while issuing traffic tickets to him and his passenger, who was the owner of the car, and that the officer had reasonable suspicion to justify detaining Mr. Flood after the original purpose of the traffic stop had ended, we affirm.

## ISSUE

[¶ 2] Mr. Flood states a single issue on appeal:

Did the state trooper lack reasonable suspicion to detain appellant while he searched the car, without consent, and therefore did the district court err in denying appellant's motion to suppress?

The State phrases the issue as:

Did the district court err in finding that Trooper Chatfield was justified in extending the investigatory stop of appellant's vehicle based on the totality of the circumstances, including: appellant's and his passenger's inconsistent accounts of their travel plans; the strong odor of cologne on them; and their inconsistent accounts involving their relationship to one another and to the young boy in the backseat?

## FACTS

[¶ 3] At approximately 1:00 p.m. on June 1, 2005, Mr. Flood was driving a car belonging to one of the passengers, Carroll Janis, east on Interstate 80 outside of Cheyenne, Wyoming. Wyoming Highway Patrol Trooper David Chatfield was patrolling the interstate with his drug detection dog and clocked Mr. Flood's car traveling 78 miles per hour in a 75 mile per hour zone. He activated his lights and stopped Mr. Flood. Trooper Chatfield exited his patrol car and spoke with Mr. Flood through the driver side window, requesting his driver's license, registration and proof of insurance. Mr. Flood provided his driver's license and Mr. Janis stated that the car belonged to him and provided the registration, but stated that the car was not insured. While gathering this information, the trooper noticed a strong smell of cologne or patchouli oil emanating from the car.

[¶ 4] Trooper Chatfield asked Mr. Flood to accompany him back to his patrol car. As he wrote out a warning for speeding, the trooper noted a strong cologne smell coming from Mr. Flood. Trooper Chatfield asked Mr. Flood about his travel plans, and he responded that he, Mr. Janis and a boy who was sitting in the back seat had left Scottsbluff, Nebraska that morning and traveled to Cheyenne to visit one of Mr. Flood's family members. He stated that the family member had to go to work, so they were returning to Scottsbluff. The trooper asked about Mr. Flood's relationship to Mr. Janis and the boy. Mr. Flood stated he was not related to Mr. Janis but they were good friends, and the boy was his twelve year old nephew. The trooper gave Mr. Flood the warning and returned his documentation.

[¶ 5] Trooper Chatfield then approached Mr. Janis and asked him to come back to the patrol car. While preparing a ticket for lack of insurance, he asked Mr. Janis about their trip. Mr. Janis stated that the three occupants of the car had driven to Cheyenne the previous afternoon, spent the night there, and were returning to Scottsbluff. He also stated that he was not related to Mr. Flood, but the boy in the backseat was his grandson. Like Mr. Flood, Mr. Janis smelled strongly of cologne or patchouli oil.

[¶ 6] Trooper Chatfield gave Mr. Janis the citation for lack of insurance, returned the documents he had supplied and told him he was free to leave. As Mr. Janis was walking back to his car, the trooper exited the patrol car and asked if he could ask him some more questions. Mr. Janis agreed, and the trooper inquired whether there was anything illegal, such as guns or drugs, in the car. Mr. Janis denied having any contraband in the car, and the trooper asked if he could search the car. Mr. Janis did not respond verbally to the trooper's request, but leaned into the car and, apparently, told Mr. Flood to open the trunk. The trooper could see a blanket covering a ball-shaped object in the trunk. Trooper Chatfield again asked if he could search the car, to which Mr. Janis responded that they needed to "get going." Taking this as a negative response, Trooper Chatfield stated that he intended to have his drug dog sniff the exterior of the car.

[¶ 7] Trooper Chatfield had all three occupants of the car get out and stand in the ditch next to the roadway. He then turned his drug dog loose and the dog alerted, indicating he detected the odor of illegal drugs. Trooper Chatfield searched the car and discovered approximately two pounds of marijuana in the trunk and approximately one ounce of cocaine in the glove box. Mr. Flood was arrested and charged with four felony counts in violation of Wyo. Stat. Ann. §§ 35–7–1031(a)(i), (ii) and (c)(ii), (iii) (LexisNexis 2007): possession of cocaine, possession of cocaine with intent to deliver, possession of marijuana, and possession of marijuana with intent to deliver.

[¶ 8] Mr. Flood filed a motion to suppress the evidence discovered during the search of the car. He claimed that he was detained in violation of the constitutional prohibitions against illegal searches and seizures. After a hearing, the district court denied Mr. Flood's motion to suppress.

[¶ 9] Mr. Flood entered into a plea agreement with the State in which he agreed to plead guilty to the two marijuana charges in exchange for dismissal of the cocaine

charges. He reserved the right to appeal the district court's denial of his motion to suppress.

## STANDARD OF REVIEW

[¶ 10] We apply the following standard in reviewing a denial of a motion to suppress evidence:

Factual findings made by a trial court considering a motion to suppress will not be disturbed unless the findings are clearly erroneous. *Meek v. State*, 2002 WY 1, ¶ 8, 37 P.3d 1279, ¶ 8 (Wyo.2002). Because the trial court has the opportunity to hear the evidence, assess witness credibility, and draw the necessary inferences, deductions, and conclusions, we view the evidence in the light most favorable to the trial court's determination. *Id.* Whether an unreasonable search or seizure occurred in violation of constitutional rights presents a question of law and is reviewed de novo. *Vasquez v. State*, 990 P.2d 476, 480 (Wyo.1999).

*O'Boyle v. State*, 2005 WY 83, ¶ 18, 117 P.3d 401, 407 (Wyo.2005). *See also, Ornelas v. United States*, 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996).

## DISCUSSION

[¶ 11] Mr. Flood asserts Trooper Chatfield detained him in violation of state and federal constitutional guarantees against unreasonable searches and seizures and, consequently, the evidence discovered during the ensuing search should have been suppressed as fruit of the poisonous tree. On appeal, he presents a "combined analysis" under Wyo. Const. art. 1, § 4 and the Fourth Amendment to the United States Constitution.

### A. *State Constitution*

[¶ 12] Although he cited to the Wyoming Constitution in his motion to suppress, Mr. Flood did not present an independent analysis to the district court to establish that the Wyoming Constitution provides different or more extensive protection than the Fourth Amendment in the context of this case.[1] In

---

1. Moreover, on appeal, Mr. Flood does not present a precise argument indicating that, under the circumstances of this case, the state constitutional guarantee against unreasonable searches and seizures provides more protection than its federal counterpart.

*Custer v. State,* 2006 WY 72, ¶¶ 11–12, 135 P.3d 620, 623–24 (Wyo.2006), we stated:

> Mr. Custer's only mention of the state constitution in the district court proceedings was a citation to Article 1, § 4 in his motion to suppress and his argument at the suppression hearing focused exclusively on the Fourth Amendment to the United States Constitution. A mere reference to a state constitutional provision in the district court is not adequate to justify our review of the issue on appeal. As we explained in *Lindsay v. State,* 2005 WY 34, ¶¶ 16–17, 108 P.3d 852, 856 (Wyo.2005), this Court refuses to consider state constitutional issues presented for the first time on appeal. We stated:
>
> > [W]hen a defendant fails to assert a cogent independent state constitutional based argument before the district court, a defendant fails to preserve such issues for appellate review.
>
> *Lindsay,* ¶ 16, 108 P.3d at 856. *See also, McChesney v. State,* 988 P.2d 1071, 1074, n. 1 (Wyo.1999) (ruling that the defendant's reference to the state constitution, without further discussion of his independent state constitutional claim, was insufficient to justify judicial consideration of the issue).
>
> A corollary rule also applies when a defendant has entered a conditional guilty plea. *Lindsay,* ¶ 17, 108 P.3d at 856.
>
> > In the same vein, upon addressing the fact that W.R.Cr.P. 11(a)(2) allows a defendant to plead guilty or nolo contendere while reserving the right to seek review on appeal of any specified pretrial motion, we set forth in *Morgan [v. State,* 2004 WY 95], ¶ 24, [95 P.3d 802, 808 (Wyo.2004)]:
> >
> > > In *Bailey [v. State,* 12 P.3d 173, 177 (Wyo.2000)], we ruled that a conditional plea of guilty does not provide carte blanche permission for the appellant to present any and all arguments on appeal. [*Bailey,*] 12 P.3d at 177–78. Instead, the appellant may only raise those issues on appeal which were clearly called to the attention of the district court. *Id.; see also, Elder v. Jones,* 608 P.2d 654, 660 (Wyo.1980). In other

words, "[w]e will not consider non-jurisdictional issues on appeal unless they have been raised before the lower court with at least a minimum effort to present a cogent legal argument." *Bailey,* 12 P.3d at 178.

*Id.* Mr. Custer did not properly raise the state constitutional argument in the district court and, consequently, we decline to consider his argument on appeal.

[¶ 13] Given the fact that Mr. Flood did not present an adequate state constitutional argument, it is not surprising that the district court analyzed the case only under the federal constitution. *Compare, Cotton v. State,* 2005 WY 115, ¶ 15, 119 P.3d 931, 934 (Wyo.2005) (addressing the state constitutional issue on appeal even though the defendant had not presented a state constitutional argument in the district court because that court independently considered the issue). Accordingly, we will limit our analysis in this decision to the appropriateness of the trooper's actions under the Fourth Amendment to the United States Constitution.

**B.  *Federal Constitution***

[¶ 14] The Fourth Amendment states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

For Fourth Amendment purposes, we recognize three tiers of interaction between police and citizens. *Custer,* ¶ 13, 135 P.3d at 624–25. *See also, Collins v. State,* 854 P.2d 688, 691–92 (Wyo.1993). The least intrusive contact between a citizen and police is a consensual encounter. *Custer,* ¶ 13, 135 P.3d at 624–25. A consensual encounter is not a seizure and does not implicate Fourth Amendment protections. The second tier is the investigatory or Terry stop, named after the seminal case *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). An inves-

tigatory detention is a seizure under the Fourth Amendment. *Custer*, ¶ 13, 135 P.3d at 624–25. However, because of its limited nature, a law enforcement officer is only required to show "the presence of specific and articulable facts and rational inferences which give rise to a reasonable suspicion that a person has committed or may be committing a crime" in order to justify the detention. *Id.*, quoting *Wilson v. State*, 874 P.2d 215, 220 (Wyo.1994). The most intrusive encounter between police and a citizen is an arrest. An arrest " 'requires justification by probable cause to believe that a person has committed or is committing a crime.' " *Id.* at 625, 135 P.3d 620 quoting *Wilson*, 874 P.2d at 219–20.

[¶ 15] The case at bar is concerned with a traffic stop, which is analogous to an "investigatory detention." *Barch v. State*, 2004 WY 79, ¶ 7, 92 P.3d 828, 831 (Wyo.2004). To determine whether the seizure was appropriate under the Fourth Amendment, we apply the two-step inquiry articulated in *Terry:* at 1) Was the initial stop justified? and 2) Were the officer's actions during the detention " 'reasonably related in scope to the circumstances that justified the interference in the first instance[?]' " *O'Boyle*, ¶ 46, 117 P.3d at 414, quoting *Campbell v. State*, 2004 WY 106, ¶ 11, 97 P.3d 781, 784 (Wyo.2004). In this case, our focus is on the second step of the process because Mr. Flood concedes the validity of the initial stop for speeding.

[¶ 16] "[A]n investigative detention must be temporary, lasting no longer than necessary to effectuate the purpose of the stop, and the scope of the detention must be carefully tailored to its underlying justification." *O'Boyle*, ¶ 47, 117 P.3d at 414. The State has the burden of demonstrating that a seizure was "sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." *Id.*, ¶ 46, 117 P.3d at 414. The officer may expand the investigative detention beyond the scope of the initial stop only if the traveler consents to the expanded detention or if "there exists an objectively reasonable suspicion that criminal activity has occurred or is occurring" or a reasonable suspicion that an occupant of the vehicle is armed. *Id.*, ¶ 48, 117 P.3d at 414, citing *Damato v. State*, 2003 WY 13, ¶ 13, 64 P.3d 700, 706 (Wyo.2003) and *Brown v. State*, 944 P.2d 1168, 1172 (Wyo.1997).

[¶ 17] The initial question raised by Mr. Flood is whether Trooper Chatfield's actions while issuing the tickets exceeded the permissible scope of the traffic stop. Mr. Flood claims the trooper did not have the right to order him and Mr. Janis to sit in his patrol car, separately, while he wrote their respective warning tickets. Mr. Flood cites to *Damato* as authority for his contention. In that case, the officer stopped Mr. Damato for a traffic violation and directed him to get out of his car and come back to the patrol car to look at the radar. The officer patted Mr. Damato down before he entered his patrol car. *Id.*, ¶ 4, 64 P.3d at 702–03. On appeal, Mr. Damato challenged the pat down search, and we held:

> [A]lthough the officer could have removed Damato from the vehicle for the sake of safety, the officer had no objectively based suspicion that Damato was armed and dangerous, and the subsequent pat-down search he performed violated Damato's Fourth Amendment rights.

*Id.*, ¶ 14, 64 P.3d at 706–07.

[¶ 18] In this case, Mr. Flood and Mr. Janis had both allegedly committed traffic violations—Mr. Flood was speeding and Mr. Janis, who was the owner of the car, did not have it properly insured. Thus, under the clear holding of *Damato*, Trooper Chatfield was justified, "for the sake of safety," in asking each of them to step back to his car while he wrote their tickets. The trooper in this case did not commit the Fourth Amendment violation condemned in *Damato* because he did not pat down the men before they entered his car.

[¶ 19] Moreover, the United States Supreme Court has unequivocally ruled that an officer may ask the driver and passengers to exit their car during the course of a routine traffic stop without violating the Fourth Amendment. *Pennsylvania v. Mimms*, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) (per curiam) (driver); *Maryland v. Wilson*, 519 U.S. 408, 117 S.Ct. 882, 137 L.Ed.2d 41

(1997) (passengers). This case presents an even stronger argument in favor of condoning the trooper's request that Mr. Janis exit the car than in *Wilson* because Mr. Janis had allegedly committed an independent Wyoming violation—failing to insure his car, while the passenger in *Wilson* had not committed an infraction.

[¶ 20] Mr. Flood also claims that he was illegally detained while Mr. Janis was sitting in the patrol car, presumably because he could not leave his passenger. The *Wilson* decision indicated that, as a practical matter, all of the occupants of a vehicle are detained during a traffic stop. *Wilson*, 519 U.S. at 413–14, 117 S.Ct. 882. The United States Supreme Court did not suggest there was a fundamental problem with the minimal intrusion into the other travelers' rights that occurs when they are required to wait for the officer to finish his business with the driver or other passengers. *See also generally, Meadows v. State*, 2003 WY 37, 65 P.3d 33 (Wyo.2003) (describing situation where passenger was detained and questioned during a traffic stop occasioned by the driver's speeding violation). Mr. Flood directs us to no express authority which would indicate he suffered a constitutional violation by having to wait while Trooper Chatfield prepared Mr. Janis' ticket. Consequently, we conclude the trooper did not illegally detain Mr. Flood by asking him or his passenger to sit in the patrol car while he issued their respective tickets.

[¶ 21] Mr. Flood next contends that the district court erred by ruling that the trooper had reasonable suspicion [2] to continue to detain him after the original purpose of the traffic stop had concluded so he could conduct the canine sniff of the car. The district court ruled:

> The initial stop of the Defendant was justified and therefore the Court must determine whether specific and articulable facts were present which gave rise to a reasonable suspicion to detain the Defendant while he ran the canine around the

car and whether the length of that detention was reasonable under the circumstances. The factors upon which the trooper determined it was reasonable to detain the Defendant were: (1) there was a strong odor of cologne on the Defendant and in the car; (2) the Defendant and the passenger were displaying extreme nervousness at significant times during their conversations; (3) there were inconsistencies between the Defendant['s] and the passenger's stories about their travel plans; and (4) the length of time the Defendant said he spent in Cheyenne was a short period of time considering the distance of travel between [Scottsbluff] and Cheyenne. In other words, it appeared suspicious that the Defendant would have traveled from [Scottsbluff] to Cheyenne for the purpose of visiting with family but would only spend a couple of hours with his family.

> In light of the totality of the circumstances, the Court finds that Trooper Chatfield did have a reasonable suspicion to detain the Defendant, particularly for the short period of time between the time the passenger expressed a preference to get going and the time it took before the dog alerted which quite literally was about two minutes.

[¶ 22] To justify a detention after the initial reason for the stop has concluded, an officer must be able to point to " 'the presence of specific and articulable facts and rational inferences which give rise to a reasonable suspicion that a person has committed or may be committing a crime.' " *Custer*, ¶ 13, 135 P.3d at 624–25, quoting *Wilson*, 874 P.2d at 220. In determining whether the officer had reasonable suspicion under the Fourth Amendment, we look to the totality of the circumstances and how those circumstances developed during the officer's encounter with the occupants of the vehicle. *Id.*, ¶ 20, 135 P.3d at 626.

[¶ 23] The first factor cited by the district court in concluding Trooper Chatfield had

---

2. The factors cited by the district court indicate it determined that the trooper had reasonable suspicion by the time he issued Mr. Janis' ticket. Thus, it is unnecessary to evaluate the effect of Mr. Janis' limited consent to additional questioning and opening the trunk and/or his subsequent refusal to consent to a further search of the car on the constitutionality of the trooper's action.

reasonable suspicion to detain Mr. Flood was the strong odor of cologne emanating from the car and Mr. Flood. At the suppression hearing, Trooper Chatfield testified that, when he first approached the vehicle, he smelled a strong odor that he recognized as musk cologne or patchouli oil. He also stated that, when he asked Mr. Flood and Mr. Janis to sit in his car, he noticed that each of the men smelled strongly of the cologne. He testified that, in his experience, drug transporters commonly use such products to mask the scent of marijuana.

[¶ 24] Mr. Flood argues that the cologne scent was not sufficient to create reasonable suspicion of drug activity. Although we agree that a strong odor of cologne, alone, generally will not give rise to a reasonable suspicion, Fourth Amendment precedent is clear that the scent of a potential masking agent is one factor which may be considered in a reasonable suspicion analysis. *See, e.g., United States v. Villa–Chaparro*, 115 F.3d 797, 802 (10th Cir.1997) (odor of detergent supported reasonable suspicion of criminal activity); *United States v. Stone*, 866 F.2d 359, 362 (10th Cir.1989) (odor of patchouli oil supported reasonable suspicion of drug offense where officer testified the oil was often used to cover the scent of marijuana). Thus, it was appropriate for the district court to consider the strong odor of a potential masking agent in its reasonable suspicion analysis.

[¶ 25] The second factor the district court relied upon in concluding the trooper had reasonable suspicion to detain Mr. Flood was the "extreme nervousness" displayed by Mr. Flood and Mr. Janis at significant points in his conversation with each of them. Mr. Flood challenges the district court's finding, claiming it was a mischaracterization of the evidence because the trooper did not testify the men acted "extremely nervous."

[¶ 26] Trooper Chatfield testified that Mr. Flood's mannerisms and body language changed when he asked certain questions. In particular, he stated that Mr. Flood would not make eye contact and seemed to have trouble formulating his answers when asked about his travel plans. Mr. Flood's reaction to that topic was significantly different than when they discussed how fast the patrol car would travel, in which case Mr. Flood looked at the trooper and spoke freely. The trooper also described Mr. Janis' behavior while sitting in the patrol car:

Q. What else did you notice about Mr. Jani[s], if anything? . . .

A. He—he also would not make eye contact. He was very fidgety in his seat. He was a much larger man and very slow moving, so when he was moving around quite a bit in my car, fidgeting quite a bit, I took that as a strong sign of nervousness on his part.

Q. Did that ever abate?

A. No. That continued throughout—throughout my conversation.

[¶ 27] We have said that generic nervousness is of little significance in establishing reasonable suspicion because "the average citizen is usually nervous when stopped by law enforcement for a routine traffic violation." *Barch*, ¶ 11, 92 P.3d at 833. *See also, Damato*, ¶¶ 23–24, 64 P.3d at 709. However, exhibiting unusual signs of nervousness is a factor that may be considered in determining whether reasonable suspicion existed. *See Meadows*, ¶¶ 19, 21, 65 P.3d at 38, 39. We explained in *Damato*, ¶ 21, 64 P.3d at 708:

It is generally accepted that nervousness upon the initial confrontation is normal and the telling information is whether the citizen calmed after the initial few minutes of the encounter. "Extreme and continued nervousness, however, 'is entitled to somewhat more weight.'" *Williams*, 271 F.3d at 1268 (quoting *United States v. West*, 219 F.3d 1171, 1179 (10th Cir.2000)).

[¶ 28] While we may not have described Trooper Chatfield's testimony as indicating Mr. Flood and Mr. Janis were "extremely nervous," the evidence does support a finding that the men were more nervous than would be expected during a routine traffic stop. Mr. Flood's reaction and level of nervousness changed based upon the topic being discussed. He would not make eye contact and had difficulty answering when the topic of discussion was his travel plans but he was comfortable when they discussed the performance of the patrol car. Mr. Janis' be-

havior while in the patrol car was also telling. He fidgeted throughout the whole encounter with Trooper Chatfield and, unlike most innocent people, he did not calm down after a few minutes with the trooper. The trooper described his behavior as "a strong sign of nervousness." While the men's nervousness, alone, may not have been enough to establish reasonable suspicion, it was appropriate for the district court to consider their reactions to the trooper and his questions as one factor in its evaluation.

[¶ 29] The third factor referenced by the district court in concluding the trooper had reasonable suspicion to detain Mr. Flood after the traffic stop had concluded was the discrepancy between Mr. Flood's and Mr. Janis' accounts of their trip. Trooper Chatfield testified Mr. Flood stated he and the passengers were returning to Scottsbluff after they had visited one of his family members in Cheyenne. Mr. Flood stated they had traveled from Scottsbluff to Cheyenne earlier in the day. The trooper testified that Mr. Janis' story was different. Mr. Janis stated that they had driven to Cheyenne the previous afternoon, spent the night, and were returning to Scottsbluff when they were stopped. The video tape of the stop confirms the trooper's testimony and also establishes that the trooper's questions about their travel plans did not amount to an improper interrogation like we criticized in *O'Boyle,* ¶¶ 52–54, 117 P.3d at 415–16.

[¶ 30] We have recognized that inconsistencies in the descriptions of travel plans given by the occupants of a vehicle stopped for a traffic violation may be a factor in determining whether a law enforcement officer had reasonable suspicion to further detain the travelers. In *Meadows,* two travelers gave consistent stories about their destination but conflicting accounts of their travel itinerary. *Meadows,* ¶ 19, 65 P.3d at 38. We concluded the inconsistency was one of several factors which supported the conclusion the trooper possessed reasonable articulable suspicion to justify continued detention of Ms. Meadows and her co-traveler. *Id. See also, Medrano v. State,* 914 P.2d 804, 808 (Wyo.1996). Consequently, we have no trouble concluding the inconsistency between Mr.

Flood's and Mr. Janis' stories about their trip was a legitimate factor in establishing reasonable suspicion.

[¶ 31] Although not relied upon by the district court in its decision denying Mr. Flood's suppression motion, the record reveals another inconsistency in the men's stories. Trooper Chatfield asked about the men's relationship to one another and to the boy riding in the backseat. Mr. Flood stated that he and Mr. Janis were good friends but were not related, and the boy was his nephew. Mr. Janis also stated that he was not related to Mr. Flood, but he stated that the boy was his grandson. The trooper testified that he found it odd that both men denied they were related to one another, but each claimed a familial relationship to the boy.

[¶ 32] On cross examination, defense counsel asked the trooper if he had considered that the boy could be Mr. Flood's brother's son, making him Mr. Flood's nephew, and Mr. Janis could be the father of Mr. Flood's brother's wife, which would make him the boy's grandfather. Under those circumstances, the men would both be related to the boy but they would not truly be related to one another. The trooper indicated that, even if that were true, he thought it was odd that the men would not claim some sort of familial association to one another. We agree and conclude that inconsistency in the men's stories was another consideration the trooper could take into account in a reasonable suspicion analysis.

[¶ 33] The final factor identified by the district court was the short duration of Mr. Flood's visit with his family in light of the relatively long roundtrip distance between Scottsbluff and Cheyenne. Although there was initially some confusion about the time the travelers arrived in Cheyenne, Trooper Chatfield finally clarified that, according to Mr. Flood, they had arrived in Cheyenne around 9:30 a.m. The trooper stopped Mr. Flood for speeding at approximately 1:00 p.m., as they were returning to Scottsbluff. The trooper testified that, based on the location of the stop, they would have left Cheyenne around noon. Thus, he considered it suspicious that they would make the relative-

ly long trip for such a short visit with a family member.

[¶ 34] The brevity of a trip, which is described in some cases as a short "turn-around" trip, is a proper consideration in a reasonable suspicion analysis. *See, e.g., United States v. Garcia,* 167 Fed.Appx. 737, 2006 WL 367843 (10th Cir.2006); *United States v. Foreman,* 369 F.3d 776, 795 n. 11 (4th Cir.2004). The district court was, therefore, justified in considering that factor in determining whether the trooper had reasonable suspicion to extend his detention of the travelers in this case.

[¶ 35] Each of the factors identified by the district court, when considered in isolation, could be interpreted as innocent behavior. Our task, however, is to look at the totality of the circumstances to determine whether the factors, considered together, justify a reasonable suspicion of illegal activity. *Meadows,* ¶ 20, 65 P.3d at 39. Although we acknowledge the evidence here is not overwhelming, the factors, including: the strong odor of a potential masking agent; the nervousness of the travelers; the inconsistency in the travelers' accounts of their trip and their relationship to one another and the boy; and the short turnaround time suggested nefarious, rather than innocent, conduct. We conclude, therefore, the totality of the circumstances established a reasonable suspicion to support further detention of Mr. Flood.

[¶ 36] Our conclusion that reasonable suspicion existed in this case is supported by other Fourth Amendment cases. In *Garcia,* the Tenth Circuit affirmed, in an unreported decision, the United States District Court for the District of Wyoming's denial of the defendant's motion to suppress. 2006 WL 367843, at 1. Garcia was a passenger in an SUV stopped by a Wyoming Highway Patrol Trooper on Interstate 80. *Id.* The Tenth Circuit ruled that the trooper had reasonable suspicion to continue detaining the defendant to conduct a canine sniff because: 1) the driver of the SUV (the defendant's grandson) was unusually nervous; 2) the travelers' gave inconsistent accounts of their trip; and 3) they were making a "quick turnaround trip." *Id.* at 3.

[¶ 37] Another case with similar, although not identical, facts further supports our conclusion that Trooper Chatfield had reasonable suspicion to detain Mr. Flood. In *Foreman,* the Fourth Circuit identified the following factors as sufficient to establish reasonable suspicion: 1) the defendant was making a short turnaround trip; 2) the defendant exhibited physical signs of extreme nervousness during the stop, which grew worse when the trooper mentioned the issue of drug smuggling; 3) there were multiple air fresheners hanging from the rearview mirror that are often used to mask the smell of narcotics; and 4) the roadway the defendant was traveling was a known corridor for illegal narcotics. *Foreman,* 369 F.3d at 784–85. Concluding the trooper had reasonable suspicion to order a dog sniff of the defendant's car, the Fourth Circuit stated: "In our opinion, the factors cited by the United States eliminate a substantial portion of innocent travelers and, therefore, amount to reasonable suspicion that Foreman was engaged in drug trafficking." *Id.* at 785.

[¶ 38] As the *Garcia* and *Foreman* courts held on the basis of similar facts, we hold that Trooper Chatfield had reasonable suspicion to detain Mr. Flood. In the words of the Fourth Circuit, the facts in this case would not have pertained to most of the innocent traveling public and gave rise to reasonable suspicion that Mr. Flood and/or his passengers were engaged in illegal activity. Thus, the trooper properly detained them to conduct a canine sniff of the vehicle.

[¶ 39] The district court did not err by denying Mr. Flood's motion to suppress. Affirmed.