2009 WY 67

**Patrick FEENEY, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

**No. S–08–0087.**

Supreme Court of Wyoming.

May 21, 2009.

Representing Appellant: Dion J. Custis of Dion J. Custis, PC, Cheyenne, Wyoming.

Representing Appellee: Bruce A. Salzburg, Wyoming Attorney General; Terry L. Armitage, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Leda M. Pojman, Assistant Attorney General. Argument by Ms. Pojman.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.

VOIGT, Chief Justice.

[¶ 1] After conditionally pleading guilty to a controlled substance offense, Patrick Feeney (the appellant) challenges the district court's denial of his motion to suppress evidence discovered during a search of the vehicle he was driving. He maintains that he was detained in violation of his constitutional rights. Concluding the highway patrol trooper had reasonable suspicion to justify detaining the appellant after the original purpose of the traffic stop had ended, we affirm.

## ISSUE

[¶ 2] The sole issue presented for our review is whether the appellant's right to be free from unreasonable searches and seizures under the Fourth Amendment of the United States Constitution was violated so as to require suppression of evidence and dismissal of charges.

## FACTS

[¶ 3] On March 20, 2007, at approximately 11:45 a.m., Trooper Jeremy Beck of the Wyoming Highway Patrol noticed a vehicle

travelling eastbound on Interstate 80. The trooper locked his radar onto the vehicle and confirmed that the vehicle was travelling 80 miles per hour in a 75 mile per hour zone. The trooper pulled the vehicle over at approximately mile marker 354, a few miles outside of Cheyenne, Wyoming. The appellant rolled down his window as the trooper approached his vehicle and the trooper immediately smelled the overwhelming scent of dryer sheets. The trooper also noticed that the only luggage in the vehicle was a backpack in the back seat. The trooper told the appellant he had pulled him over for speeding and the appellant provided the trooper his Massachusetts driver's license and the rental agreement for the vehicle.

[¶ 4] The appellant then accompanied the trooper back to the trooper's vehicle where the appellant sat in the front passenger seat. The trooper informed the appellant that he was going to write him a warning for speeding and began to review the rental agreement. While reviewing the agreement, the trooper asked the appellant where he was travelling. The appellant stated he was going home to Massachusetts from Oakland, California, where he had been visiting friends. The rental agreement, however, required the appellant to return the vehicle in California. Despite the discrepancy between appellant's statement concerning his travel plans (returning home to Massachusetts) and the terms of the rental agreement (return the vehicle to California), the trooper issued a warning ticket and told the appellant he was free to go.

[¶ 5] As the appellant returned to his vehicle the trooper reinitiated contact as the appellant was getting in the driver's side door. The trooper asked the appellant if he would be willing to answer a few more questions about the rental agreement before he left. In response, the appellant stated that he was in a hurry and asked why the trooper wanted to ask more questions. The trooper explained to the appellant his concern that the rental agreement showed that the appellant was to return the vehicle to Oakland, California, and the appellant had told the trooper that he was taking the vehicle to Massachusetts. The appellant responded that he had called the rental company and changed the destination to Massachusetts. Upon the trooper's request, the appellant told the trooper he could call the rental company to verify the change in the final destination. The trooper called the rental company and asked about the change; however, the company had no record of any change in the agreement. When the trooper asked if there was any way the destination could have been changed and not entered into the computer system, the rental company representative stated that any change is updated immediately throughout all of the rental company's computers. The trooper concluded his phone call to the rental company and told the appellant that they had no record of any changes to the rental agreement. The appellant responded, "that's weird because I did call." The trooper then asked the appellant if he was initially planning to bring the vehicle back to California when he first rented the vehicle and the appellant responded "no."

[¶ 6] After this conversation concerning the rental agreement, the trooper asked the appellant if there were any illegal drugs in the vehicle. The appellant responded that there were not. The trooper then asked if the appellant would consent to a search of the vehicle. The appellant refused. The trooper then told the appellant that he was going to detain him until a K–9 unit arrived to perform a "free-air" sniff around the vehicle. The K–9 unit arrived a short time later and alerted in the vicinity of the back door and trunk of the appellant's vehicle. The trooper searched the vehicle and found a duffle bag containing airtight packages of what was ultimately confirmed to be marijuana.

[¶ 7] On March 21, 2007, the appellant was charged with one count of possession of marijuana with the intent to deliver, in violation of Wyo. Stat. Ann. § 35–7–1031(a)(ii) (LexisNexis 2007). On May 25, 2007, the appellant filed a motion to suppress, asserting that the search of his vehicle and seizure of the marijuana was in violation of his constitutional rights under both the Wyoming and United States Constitutions and thus the marijuana evidence should not be admissible.

A hearing on the appellant's motion was held on August 8, 2007, and the district court entered an Order Denying Motion to Suppress on August 24, 2007.

[¶ 8] The parties filed a Plea Agreement for Recommended Disposition wherein the appellant entered a guilty plea to the charged crime and reserved his right to appeal the district court's ruling. As part of the plea agreement, the state agreed to dismiss the felony possession charge and to recommend a sentence of three to five years incarceration, with the sentence to be suspended in lieu of four years of supervised probation. The appellant was sentenced as described above and then timely filed a notice of appeal.

## STANDARD OF REVIEW

[¶ 9] When reviewing a district court's ruling on a motion to suppress, this Court does not disturb findings on factual issues made by the district court unless they are clearly erroneous. *State v. Evans*, 944 P.2d 1120, 1124 (Wyo.1997) (citing *Bravo v. State*, 897 P.2d 1303, 1305 (Wyo. 1995)). At the suppression hearing, the district court has the opportunity to assess the credibility of the witnesses and the weight to be given the evidence and to make the necessary inferences, deductions and conclusions; therefore, we view the evidence in the light most favorable to the district court's determination. *Evans*, 944 P.2d at 1124 (citing *Wilson v. State*, 874 P.2d 215, 218 (Wyo.1994)). On those issues where the district court has not made specific findings of fact, this Court will uphold the general ruling of the court below if supported by any reasonable view of the evidence. *Neilson v. State*, 599 P.2d 1326, 1330 (Wyo.1979). The issue of law, whether an unreasonable search or seizure has occurred in violation of constitutional rights, is reviewed de novo. *McChesney v. State*, 988 P.2d 1071, 1074 (Wyo.1999). A district court judgment may be affirmed on any proper legal grounds supported by the record. *Robinson v. State*, 11 P.3d 361, 367 (Wyo.2000); *see also Chapman v. State*, 638 P.2d 1280, 1286 n. 7 (Wyo.1982);

*Jones v. State*, 602 P.2d 378, 382 (Wyo. 1979).

*State v. Williams*, 2004 WY 53, ¶ 12, 90 P.3d 85, 88 (Wyo.2004).

## DISCUSSION

[¶ 10] The appellant concedes that the traffic stop was justified and that the trooper's initial questioning inside the patrol car was proper and did not exceed the scope of the stop. However, the appellant claims that he did not consent to further questioning after he exited the trooper's vehicle and that the trooper did not have reasonable suspicion to further detain him once the appellant received his warning ticket. Because we conclude that the trooper had reasonable suspicion to justify expanding the scope of the questioning and to further detain the appellant, we will confine our analysis to that dispositive question.

### *Independent State Constitutional Analysis*

[¶ 11] The appellant raises his claim under both the Fourth Amendment to the United States Constitution and Article 1 § 4 of the Wyoming Constitution. We have said that when a litigant endeavors to interpret the Wyoming Constitution independent of the Federal Constitution, the litigant "must provide a precise, analytically sound approach when advancing" such a claim. *Vasquez v. State*, 990 P.2d 476, 484 (Wyo.1999) (citing *Dworkin v. L.F.P., Inc.*, 839 P.2d 903, 909 (Wyo.1992)). Six factors must be analyzed when a separate state constitutional claim has been raised: 1) the textual language; 2) the differences in the text; 3) constitutional history; 4) preexisting state law; 5) structural differences; and 6) matters of particular state or local concern. *Saldana v. State*, 846 P.2d 604, 621–24 (Wyo. 1993) (Golden, J., concurring).

[¶ 12] The appellant's attempt to present an independent state constitutional claim falls short. Although he mentions the above-cited factors, he fails to analyze any of them, or even generally describe how Article 1 & 4 might provide him greater protection than the Fourth Amendment. We will therefore confine our analysis to the Fourth Amendment.

*Fourth Amendment*

■■■■ [¶ 13] The Fourth Amendment to the United States Constitution states:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. We recognize three tiers of interaction between police and citizens for Fourth Amendment purposes:

The least intrusive contact between a citizen and police is a consensual encounter. *Custer* [*v. State*, 2006 WY 72], ¶ 13, 135 P.3d [620], 624–25 [ (Wyo.2006) ]. A consensual encounter is not a seizure and does not implicate Fourth Amendment protections. The second tier is the investigatory or Terry stop, named after the seminal case *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). An investigatory detention is a seizure under the Fourth Amendment. *Custer*, ¶ 13, 135 P.3d at 624–25. However, because of its limited nature, a law enforcement officer is only required to show "the presence of specific and articulable facts and rational inferences which give rise to a reasonable suspicion that a person has committed or may be committing a crime" in order to justify the detention. *Id.*, quoting *Wilson v. State*, 874 P.2d 215, 220 (Wyo.1994). The most intrusive encounter between police and a citizen is an arrest. An arrest " 'requires justification by probable cause to believe that a person has committed or is committing a crime.' " *Id.* at 625, 135 P.3d 620 quoting Wilson, 874 P.2d at 219–20.

*Flood v. State*, 2007 WY 167, ¶ 14, 169 P.3d 538, 543–44 (Wyo.2007). A traffic stop is more analogous to an investigative detention than a custodial arrest; therefore the reasonableness of such a stop is analyzed under the two-part test articulated in *Terry v. Ohio:* 1) whether the initial stop was justified; and 2) whether the officer's actions during the detention were "reasonably related in scope to the circumstances that justified the interference in the first instance." *Damato v. State*, 2003 WY 13, ¶ 9, 64 P.3d 700, 705 (Wyo.2003) (citing *Wilson v. State*, 874 P.2d 215, 223 (Wyo.1994)).

During a routine traffic stop, a law enforcement officer may request a driver's license, proof of insurance and vehicle registration, run a computer check, and issue a citation. *Campbell* [*v. State*, 2004 WY 106], ¶ 12, 97 P.3d [781,] 785 [ (Wyo.2004) ]; *Damato*, ¶ 13, 64 P.3d at 706 (citing *Burgos–Seberos v. State*, 969 P.2d 1131, 1133 (Wyo.1998); *United States v. Elliott*, 107 F.3d 810, 813 (10th Cir.1997)). Generally, the driver must be allowed to proceed on his way without further delay once the officer determines the driver has a valid driver's license and is entitled to operate the vehicle. *Damato*, ¶ 13, 64 P.3d at 706; *see also United States v. Wood*, 106 F.3d 942, 945 (10th Cir.1997); *Barch* [*v. State*, 2004 WY 79], ¶ 9, 92 P.3d [828,] 832 [ (Wyo. 2004) ]. In the absence of consent, an officer may expand the investigative detention beyond the purpose of the initial stop only if there exists an " 'objectively reasonable and articulable suspicion' that criminal activity has occurred or is occurring." *Damato*, ¶ 13, 64 P.3d at 706 (quoting *United States v. Williams*, 271 F.3d 1262, 1267 (10th Cir.2001)). The existence of objectively reasonable suspicion of criminal activity is determined by evaluating the totality of the circumstances. *Damato*, ¶ 16, 64 P.3d at 707. The "whole picture" must be considered, "[c]ommon sense and ordinary human experience are to be employed, and deference is to be accorded a law enforcement officer's ability to distinguish between innocent and suspicious actions." *Id.* (citing *Wood*, 106 F.3d at 946).

*Garvin v. State*, 2007 WY 190, ¶ 14, 172 P.3d 725, 729 (Wyo.2007). Finally,

The Supreme Court has instructed that we not examine each factor adding up to reasonable suspicion individually, but that we evaluate how convincingly they fit together into a cohesive, convincing picture of illegal conduct. In [*United States v.] Arvizu*, [534 U.S. 266, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) ], the Court rejected what is

called a "divide-and-conquer analysis," noting that reasonable suspicion may exist even if "each observation" is "susceptible to an innocent explanation." *Arvizu,* 534 U.S. at 274, 122 S.Ct. 744.

*Id.* at 2007 WY 190, ¶ 16, 172 P.3d at 730 (quoting *United States v. Guerrero,* 472 F.3d 784, 787 (10th Cir.2007)).

[¶ 14] In this case, the district court's order denying the motion to suppress listed the factors it found provided the trooper reasonable suspicion to further detain the appellant:

> Here, it appears there were numerous factors present that led Trooper Beck to conclude that he had reasonable suspicion that some illicit activity was occurring. These factors include: 1) the overwhelming smell of dryer sheets emanating from the Defendant's car with no dryer sheets or laundry in sight; 2) there was only one small bag visible in the back seat; 3) the Defendant exhibited extreme nervousness and this nervousness did not subside even after the Defendant was informed he would only be receiving a warning; 4) the Defendant's travel plans were inconsistent with the rental agreement; and, 5) upon being questioned about his travel plans, the Defendant initially claimed he had called [the rental company] to inform them of his intention to return the car in Massachusetts but then stated he never had any intention to return the car in California.

[¶ 15] The appellant does not dispute the district court's factual findings surrounding the above factors, rather he contends that these facts were insufficient to provide the trooper with reasonable suspicion to justify further detention and questioning. We disagree. When we view facts surrounding the traffic stop and the factors considered by the district court in context of the totality of the circumstances, we must affirm the district court's conclusion that the trooper had reasonable suspicion of criminal activity.

[¶ 16] We begin with the scent of dryer sheets. "Fourth Amendment precedent is clear that the scent of a potential masking agent is one factor which may be considered in a reasonable suspicion analysis." *Flood,* 2007 WY 167, ¶ 24, 169 P.3d at 546 (citing

*United States v. Villa–Chaparro,* 115 F.3d 797, 802 (10th Cir.1997) (odor of detergent supported reasonable suspicion of criminal activity)); *United States v. Stone,* 866 F.2d 359, 362 (10th Cir.1989) (odor of patchouli oil supported reasonable suspicion of drug offense where officer testified the oil was often used to cover the scent of marijuana). This Court has found that the strong odor of dryer sheets, especially in the case of rental cars, which typically do not need strong air fresheners, is a factor that may be properly considered in a determination of reasonable suspicion. *Garvin,* 2007 WY 190, ¶¶ 15–17, 172 P.3d at 729–30.

[¶ 17] Here, the trooper testified that the overwhelming smell of dryer sheets—which was immediately apparent when the appellant rolled down the window—was unusual because based on his training and experience having pulled over "lots and lots" of rental vehicles, such vehicles typically have a "clean car" or "new car" scent. The trooper also testified that, based on his training and experience, dryer sheets are used to mask the odor of a controlled substance. Also, the trooper did not see any dryer sheets or laundry in the vehicle that would explain the strong odor. We find that the district court properly considered this factor in its reasonable suspicion analysis.

[¶ 18] The next factor the district court considered was the appellant's extreme and continuing nervousness. "[G]eneric nervousness is of little significance in establishing reasonable suspicion because 'the average citizen is usually nervous when stopped by law enforcement for a routine traffic violation.'" *Flood,* 2007 WY 167, ¶ 27, 169 P.3d at 546 (citing *Barch v. State,* 2004 WY 79, ¶ 11, 92 P.3d 828, 833 (Wyo.2004)). "It is generally accepted that nervousness upon the initial confrontation is normal and the telling information is whether the citizen calmed after the initial few minutes of the encounter. 'Extreme and continued nervousness, however, "is entitled to somewhat more weight."'" *Damato,* 2003 WY 13, ¶ 21, 64 P.3d at 708 (quoting *United States v. Williams,* 271 F.3d 1262, 1268 (10th Cir.2001)).

[¶ 19] The trooper testified that during the short conversation that took place at the driver's side window of the appellant's vehicle, the appellant was acting very nervous. He appeared to be trying to avoid conversing with the trooper by looking straight forward and to the floorboard and the appellant's hands were shaking so badly that he had to put them down on his pant leg to control the shaking. The trooper testified that, based on his experience, most individuals make eye contact with him and their attention is focused on him during a traffic stop, as most individuals want to know the reason for the stop, what they did wrong, and whether the trooper is going to give them a ticket. The trooper also testified that he found it unusual that the appellant's nervousness continued even after the trooper informed him that he was only going to write him a warning for speeding. The trooper testified:

> Just off my training experience, when I speak with people, you can kind of get a judge of if—how they are reacting to you as in nervous behavior. A lot [of] times when you stop people and you stop them for speeding or for lane use, that type of thing, the biggest factor for them is whether or not they are getting a ticket or a warning. A lot of times they are very nervous up-front because they are thinking they are going to have to pay a fine. And as a traffic stop goes on, their nervous behavior usually subdues down quite a bit.

The trooper also noted the appellant's continued nervous behavior while the trooper reviewed the rental agreement. The trooper testified that in his experience most motorists will engage him in conversation as he looks over a rental agreement, asking him what he is looking for or offering to help the trooper by providing additional information. Finally, even after the trooper told the appellant he was only issuing him a warning and that he was free to go, the trooper described the appellant's continued nervousness:

Q. What was his demeanor like when he was leaving your car?

A. Hurriedly, as if he was wanting to get away from me, he's done. He was still nervous. The nervousness had never subdued. In fact, as he exited the patrol car and went back to his vehicle, it was more at a fast walk as he was trying to get away from the patrol car.

We find that it was proper for the district court to consider the appellant's continuing nervousness as a factor in the reasonable suspicion determination.

[¶ 20] Finally, we turn to the inconsistencies in appellant's statements regarding his travel plans. We have recognized that unusual or inconsistent travel plans are a proper consideration in a reasonable suspicion analysis. *Flood*, 2007 WY 167, ¶¶ 30, 33, 169 P.3d at 547–48; *see also United States v. Wood*, 106 F.3d 942, 946–47 (10th Cir.1997) ("unusual travel plans may provide an indicia of reasonable suspicion"); *United States v. Mendez*, 118 F.3d 1426, 1431 (10th Cir.1997) ("contradictory or implausible travel plans can contribute to a reasonable suspicion of illegal activity").

[¶ 21] During their initial conversation, the appellant told the trooper that he was returning home to Massachusetts from California where he had been visiting friends. The trooper became suspicious of this statement after seeing that the terms of the rental agreement required the appellant to return the vehicle to California. Further, the trooper testified that he was concerned that although the rental agreement required the vehicle to be returned to the same location where it was rented, the appellant's statements indicated that it was actually one-way rental. The trooper testified that in his experience, one-way rental vehicles are often used to transport illegal drugs.

A. Like I was saying, a lot of vehicles that are being used to transport illegal drugs are rental vehicles. And there are several different reasons why they use rental vehicles.

Rental vehicles are used for not having liability if the vehicle gets seized because it goes back to the rental company. They are not losing their vehicle. If they rent a vehicle, they don't have to worry about it being their own vehicle. They can take that vehicle, take it to another area in the United States, drop that vehicle off, and get on a plane to fly back and can erase

their hands from it to be done and over with.

Q. So are you indicating that it's just the fact that it's a rental vehicle, or is it—would it be suspicious if it's a one-way rental vehicle?

A. One-way rental vehicle.

Finally, although the appellant represented to the trooper that he had called the rental company to resolve the discrepancies in the rental agreement, when the trooper contacted the rental company, they had no record of any contact by the appellant. We find that the district court properly considered this factor in its reasonable suspicion analysis.

## CONCLUSION

[¶ 22] The behaviors and observations discussed above, when considered in isolation, could be interpreted as innocent. Our task, however, is to look at the totality of the circumstances to determine whether these facts, when considered together, justify a reasonable suspicion of illegal activity. Looking at the whole picture, we affirm the district court's determination inasmuch as the overwhelming smell of dryer sheets, the appellant's extreme and continuing nervousness, and the appellant's behaviors related to the irregularities in his travel plans provided the trooper with reasonable suspicion to detain the appellant until the K–9 unit arrived.

[¶ 23] Affirmed.