2010 WY 107

**Matthew Robert FRAZIER, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

No. S–09–0205.

Supreme Court of Wyoming.

July 30, 2010.

Representing Appellant: Dion J. Custis, Dion J. Custis, PC, Cheyenne, Wyoming.

Representing Appellee: Bruce A. Salzburg, Attorney General; Terry L. Armitage, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Paul S. Rehurek, Senior Assistant Attorney General; Leda M. Pojman, Assistant Attorney General. Argument by Mr. Rehurek.

Before KITE, C.J., and GOLDEN, HILL, VOIGT *, and BURKE, JJ.

BURKE, Justice.

[¶ 1]   Appellant, Matthew Robert Frazier, entered a conditional plea of guilty to one count of possessing marijuana with the intent to deliver.  He reserved the right to appeal the district court's denial of his motion to suppress.  Mr. Frazier maintains that evidence obtained in the search of the vehicle should have been suppressed because no reasonable suspicion existed to detain him for a dog sniff of his vehicle following the conclu-

* Chief Justice at time of oral argument.

sion of a traffic stop.  We find no error and affirm.

### ISSUE

[¶ 2]   Mr. Frazier presents one issue:

Did the trial court abuse its discretion and commit reversible error when it denied Mr. Frazier's motion to suppress?

### FACTS

[¶ 3]   On October 7, 2008, at approximately 8:50 a.m., Mr. Frazier was traveling east on I–80 near Pine Bluffs, Wyoming.  A Wyoming Highway Patrol trooper was in his vehicle, parked in the median, when he observed the Frazier vehicle.  He was unable to view the state name on the rear plate of Mr. Frazier's vehicle because it was obstructed by a license plate bracket.  The trooper initiated a traffic stop, exited the patrol car, and approached Mr. Frazier's vehicle from the passenger side.  He advised Mr. Frazier of the reason for the stop.

[¶ 4]   As he spoke with Mr. Frazier, the trooper noticed a bottle of air freshener and two bottles of cologne on the front seat. He also noticed an atlas open to a map of the state of California.  The trooper observed that Mr. Frazier's right leg was visibly shaking and that his arms and hands trembled nervously as he looked for his license and registration.  Mr. Frazier explained that he had been on a road trip to see the west, but was headed back to Tennessee to see his sick grandfather.

[¶ 5]   The trooper had Mr. Frazier join him in his patrol car while he verified the driver's license and wrote a warning.  The trooper noted that Mr. Frazier was extremely nervous, and continued shaking even after he was told he would only receive a warning. While waiting for dispatch to report on the driver's license, the trooper asked Mr. Frazier about his travel plans.  Mr. Frazier said that he lived in Tennessee but drove to Reno for a road trip.  He had been in Reno for three days and had wanted to drive through Idaho on his way back home.  Mr. Frazier volunteered that his grandfather, who had

been in assisted living, had become very ill. Mr. Frazier said he had to cut his road trip short when he got the news, and was now on his way to see his dying grandfather.

[¶ 6] The trooper issued a written warning and returned Mr. Frazier's license and registration. As Mr. Frazier was walking back to his vehicle, the trooper inquired if he could ask a few more questions and Mr. Frazier agreed. The trooper asked additional questions about Mr. Frazier's travel plans. He also asked if Mr. Frazier had any illegal drugs in the vehicle. Mr. Frazier replied that he did not, but his face turned "white" and "pale." The trooper twice asked for Mr. Frazier's consent to search the vehicle. Each time Mr. Frazier replied that he was in a hurry and had to be on his way. The trooper took this as a "no" and informed Mr. Frazier that he was within his rights to decline the search. The trooper then advised Mr. Frazier that he suspected Mr. Frazier was transporting controlled substances and that he would be detained until a canine unit arrived and conducted an external sniff of the vehicle. The trooper called for the canine unit at 9:00 a.m. It arrived at 9:53 a.m. The dog alerted to the presence of drugs in the vehicle. A subsequent search of the vehicle revealed 22 pounds of marijuana and various other drug paraphernalia in the trunk.

[¶ 7] Mr. Frazier was arrested and charged with possession of marijuana, in violation of Wyo. Stat. Ann. § 35–7–1031(c)(iii) (LexisNexis 2007), and possession of marijuana with the intent to deliver, in violation of Wyo. Stat. Ann. § 35–7–1031(a)(ii). He filed a motion to suppress alleging the trooper did not have reasonable suspicion to detain him while they waited for the canine unit to arrive. The district court denied the motion. Pursuant to a conditional guilty plea agreement, Mr. Frazier pled guilty to possession of marijuana with the intent to deliver and

reserved the right to appeal the denial of his motion to suppress. In exchange, the State dismissed the possession of marijuana charge. Mr. Frazier was sentenced to two to four years of incarceration. Execution of the sentence was suspended, and Mr. Frazier was placed on three years of probation. He filed this timely appeal.

## STANDARD OF REVIEW

[¶ 8] When reviewing a district court's decision on a motion to suppress evidence, we defer to the court's findings on factual issues unless they are clearly erroneous. *Lovato v. State*, 2010 WY 38, ¶ 11, 228 P.3d 55, 57 (Wyo.2010). "We view the evidence in the light most favorable to the district court's decision because it is in the best position to assess the witnesses' credibility, weigh the evidence and make the necessary inferences, deductions and conclusions." *Leyva v. State*, 2009 WY 149, ¶ 9, 220 P.3d 791, 794 (Wyo.2009). The constitutionality of a particular search or seizure, however, is a question of law that we review *de novo. Id.*

## DISCUSSION

[¶ 9] The Fourth Amendment to the United States Constitution protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.[1] A routine traffic stop constitutes a seizure within the meaning of the Fourth Amendment "even though the purpose of the stop is limited and the resulting detention quite brief." *Damato v. State*, 2003 WY 13, ¶ 9, 64 P.3d 700, 704 (Wyo.2003). When determining if a "seizure" was reasonable, we apply the two-step inquiry established in *Terry v. Ohio*, 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968). Under that inquiry, we must determine: 1)

---

1. Mr. Frazier also asserts that his detention violated his rights under Art. 1, § 4 of the Wyoming Constitution. He has failed, however, to provide a "precise, analytically sound" approach required for this Court to undertake an independent state constitutional analysis. *Leyva*, ¶ 11, 220 P.3d at 794. We therefore decline to consider the issue further. We note Mr. Frazier's argument is very similar to the one we refused to consider in *Leyva* ("Essentially, Leyva's argument is disjointed and consists of little more than a recitation and summary of passages from *Vasquez v. State*, 990 P.2d 476 (Wyo.1999), and *O'Boyle v. State*, 2005 WY 83, 117 P.3d 401 (Wyo.2005), and an assertion, unsupported by any cogent analysis, that his continued detention was constitutionally unreasonable. We therefore decline to consider it."). *Id.*

whether the initial stop was justified, and 2) were the officer's actions during the detention "reasonably related in scope to the circumstances that justified the interference in the first instance." *Wallace v. State,* 2009 WY 152, ¶ 12, 221 P.3d 967, 970 (Wyo.2009).

### Initial Stop

[¶ 10] Although Mr. Frazier describes the offending license plate bracket as a "minor infraction," he appears to concede that the obstructed license plate provided a valid basis for the traffic stop. He also does not take serious issue with the length of the initial stop. He suggests that the trooper's questions, as he wrote out the traffic warning, were unreasonable because they were unrelated to the purpose of the stop.

[¶ 11] We have previously recognized that:

> During a routine traffic stop, a law enforcement officer may request the driver's proof of insurance, operating license, and vehicle registration, run a computer check, and issue a citation or warning. The officer may detain the driver and his vehicle only for the period of time reasonably necessary to complete these routine matters. Once the driver has produced a valid driver's license and proof that he is entitled to operate the vehicle, he must be allowed to proceed without further delay. During the stop, an officer generally may not ask the detained motorist questions unrelated to the purpose of the stop, including questions about controlled substances, unless the officer has reasonable suspicion of other illegal activity.

*Campbell v. State,* 2004 WY 106, ¶ 12, 97 P.3d 781, 785 (Wyo.2004) (internal citations omitted).

[¶ 12] When the trooper initially approached the vehicle, he informed Mr. Frazier of the reason for the stop and briefly asked about his travel plans. Once Mr. Frazier was in the patrol car, the trooper asked him where he had been on his road trip, how long he had been in Reno, and how long he had lived in Tennessee. Mr. Frazier answered these questions and volunteered information about his sick grandfather. The trooper followed up with two questions about the seriousness of the grandfather's condition. Although these questions may not have been directly related to the obstructed license plate, the scope of the inquiry was not unreasonable under the circumstances. We have recognized travel plans as an acceptable area of limited inquiry during a routine traffic stop. *Lovato,* ¶ 27, 228 P.3d at 61. The trooper did not ask Mr. Frazier about illegal substances during this exchange. The questioning also did not unreasonably delay the stop. Mr. Frazier entered the patrol car at 8:52 a.m. and the trooper returned his license and registration along with the written warning at 8:56 a.m. Considered in light of all the surrounding circumstances, the trooper's few questions relating to travel plans were not unreasonable. *Cf. O'Boyle,* ¶¶ 7, 59, 117 P.3d at 404, 417 (holding an officer's extensive inquiry during initial stop, consisting of more than thirty questions which were almost all unrelated to the traffic stop, was unreasonable).

### Consent to Additional Questioning

[¶ 13] While in the patrol car, the trooper issued a written warning and returned Mr. Frazier's driver's license and registration. Mr. Frazier then exited the patrol car and the trooper initiated additional questioning. Mr. Frazier contends that he did not voluntarily consent to the additional questioning and was, therefore, improperly detained by the trooper.

[¶ 14] In determining whether consent is voluntary, we consider the totality of the circumstances including how law enforcement phrased the request, whether the officer told the individual that he could refuse the request, and the presence of other coercive factors. *Grant v. State,* 2004 WY 45, ¶ 22, 88 P.3d 1016, 1021 (Wyo.2004). "We must consider all the circumstances surrounding the encounter to determine whether a reasonable person would have felt free to decline the officer's requests or otherwise terminate the encounter." *Id.* (quotation marks omitted).

[¶ 15] When the trooper re-initiated contact with Mr. Frazier, he asked: "Do you mind if I ask you a few more questions?"

Mr. Frazier replied: "Yeah, sure," and the trooper followed up by stating: "Just so you know you don't have to answer any more questions if you don't want to." He directed Mr. Frazier to the side of the road, apparently for safety reasons, and asked additional questions. He did not threaten Mr. Frazier or block his way. Mr. Frazier does not identify the presence of any other coercive factors which may have affected his decision to answer more questions. Under these circumstances, a reasonable person would feel free to decline the trooper's requests. Indeed, Mr. Frazier declined the trooper's request to search the vehicle later in the conversation. Because Mr. Frazier voluntarily consented to the questioning, he was not unlawfully detained during this stage of the stop.

### Detention until Canine Unit Arrived

[¶ 16] The State concedes that once the trooper asked for permission to search Mr. Frazier's car and he declined, the detention was no longer consensual and required reasonable suspicion.

> The law is well settled that a law enforcement officer may detain a motorist if the officer has an objectively reasonable suspicion that the person is engaged in criminal activity. *Barch v. State*, 2004 WY 79, ¶ 9, 92 P.3d 828, 832 (2004); *Damato v. State*, 2003 WY 13, ¶ 13, 64 P.3d 700, 706 (2003); *see also United States v. Williams*, 271 F.3d 1262, 1268 (10th Cir.2001). The existence of objectively reasonable suspicion of criminal activity is determined by evaluating the totality of the circumstances. *Damato*, ¶ 16, 64 P.3d at 707. The "whole picture" must be considered; "[c]ommon sense and ordinary human experience are to be employed, and deference is to be accorded a law enforcement officer's ability to distinguish between innocent and suspicious actions." *Id.* (citing *United States v. Wood*, 106 F.3d 942, 946 (10th Cir.1997)).

*Leyva*, ¶ 12, 220 P.3d at 794. In determining whether an officer had reasonable suspicion, we look to the totality of the circumstances and how those circumstances developed during the officer's encounter with the occupant of the vehicle. *Sutton v. State*, 2009 WY 148, ¶ 11, 220 P.3d 784, 788 (Wyo.2009).

[¶ 17] At the hearing on Mr. Frazier's motion to suppress, the trooper testified about his experience and training:

[Trooper]: . . . In 2004 I attended the first three stages of Desert Snow training. . . . It is geared specifically towards highway drug interdiction. It covers all aspects of that. . . . It covers—I guess it entails picking up and showing you the vehicle indicators that you might come across of somebody that's transporting these types of drugs, body behavior. It talks about what these people might display. It covers interview and interrogation. It also covers where to find these vehicles and search techniques. Also covers courtroom testifying. Kind of a broad training that covers several different aspects. . . . They will—they had examples set up of, like, cover[-]ups like air fresheners that are in the vehicle; things to look for such as multiple maps, multiple cell phones, luggage, and talking, possibly the lack thereof, just the general description of the vehicle, what the vehicle looks like. It could be as specific as was the vehicle recently cleaned when every other vehicle is dirty; what that might eventually lead to and what that could possibly show.

[Prosecutor]: And then you mentioned that you received training on what to look for in the persons in those vehicles?

A. Correct.

Q. What are some of those things?

A. Well, obviously, these people can't come out and tell you they're hauling an illegal amount of narcotics in the vehicle, who would? Further, these people have to lie. These classes are geared around what to look for in body language, and stories, and what has been seen in the past, and what typically hold[s] true to some person that's conducting these type[s] of activities.

Q. When you say, "stories," what exactly do you mean?

A. Obviously, "stories," I mean, there again, they can't tell you that they're hauling these drugs. They have to make up a story. In these trainings they provide examples of reports and cases of things that

have happened in the past, and typically, a lot of this stuff is redundant. It happens over and over again. Things to look for in how the person is telling you what he's doing.

Q. And you mentioned interview and interrogation techniques that you're trained?

A. Correct.

Q. Specifically, what do you mean by that?

A. Well, how to conduct the interview, and basically, for us at the highway patrol the interview is done in our vehicle on the side of the road. It's not like you take somebody to a station and do that. It is the interview and interrogation techniques that apply to us, [it] would be reading people's body language and trying to put together the totality of the story that they're telling you from what you see and how they're coming across and explaining this to you.

Q. All right. And on body language, were you thinking of something in particular?

A. Particularly, body language, the expressions on their face, their gesturing, their tone of voice. Is their voice cracking? Are they trying to control their voice? It's really pretty hard to lie, and especially, when you're in an uncomfortable position, possibly stopped on the side of the road, trying to put together a story and lie, it's not easy to do.

Q. I meant to ask you, have you had experience out on the road stopping vehicles that eventually you discovered illegal drugs in them?

A. I have. I don't have a concrete number, but since about approximately 2005 I have anywhere between 25 and 30 felony criminal drug interdiction stops.

Q. And in those situations you employed your training and the knowledge that you learned in reading people, assessing their vehicle and their behaviors and applied that, and that turned out there was drugs?

A. Correct.

The trooper went on to testify regarding the specific facts of the traffic stop. He was the only witness who testified at the hearing.

Relying on this testimony, the district court concluded that the totality of the circumstances created a reasonable suspicion of criminal behavior sufficient to justify Mr. Frazier's detention until the canine unit arrived.

[¶ 18] The first factor cited by the district court in concluding the trooper had reasonable suspicion to detain Mr. Frazier was the presence of air freshener and cologne in the vehicle. The presence of odor suppressing agents, alone, does not give rise to reasonable suspicion, but can be a factor contributing to the totality of the circumstances. *Flood v. State,* 2007 WY 167, ¶ 24, 169 P.3d 538, 546 (Wyo.2007) (scent of cologne contributed to reasonable suspicion); *Leyva,* ¶ 13, 220 P.3d at 794 (strong odor of air freshener in car). The trooper testified that items such as cologne or air fresheners are often used to mask the odor of illegal drugs by those transporting them. He testified that the presence of odor suppressing agents was a factor that aroused his suspicion. We note that the trooper testified he had only observed the items. He did not testify that he smelled the cologne or the air freshener. We have recognized that the presence of odor suppressing items can be a factor contributing to reasonable suspicion, even if the items are not in use at the time of the stop. *See Sutton,* ¶ 22, 220 P.3d at 790 (oven-cooking bags). As the district court observed:

> When the Trooper observed immediately on his approach to the car the presence of [air freshener] and cologne in it, he would certainly at least be more attuned to other indicia than he otherwise would be. There was no apparent reason for the odor-masking agents.

[¶ 19] Mr. Frazier's extreme and prolonged nervousness was a second factor the district court relied upon in finding the trooper had reasonable suspicion. Nervousness is generally considered of limited significance because it is not uncommon for most citizens, whether innocent or guilty, to exhibit signs of nervousness when confronted by a law enforcement officer. *Damato,* ¶ 20, 64 P.3d at 708. "Extreme and continued ner-

vousness, however, is entitled to somewhat more weight." *Id.,* ¶ 21, 64 P.3d at 708.

[¶ 20]  The trooper testified that "right off the bat ... Mr. Frazier appeared to be considerably more nervous than the average person that [he] would come across or stop." Mr. Frazier was notified that he would receive only a warning, but he continued to shake nervously.  The trooper observed that Mr. Frazier gestured wildly and moved his hands around while he was speaking.  During a lull in the conversation, Mr. Frazier continued to fidget in his seat.  At one point, Mr. Frazier folded his hands between his legs, however the muscles in his arms continued to twitch.  The district court observed:

> The cases indeed, as pointed out by [Mr.] Frazier in his brief, hold that the observation of nervousness is to be expected in a citizen-police encounter.  [The trooper's] observation was that even accounting for this, the level of shaking and agitation was unusual and it did not abate as normally it does when the subject is told that there will be only a warning.  There was no apparent reason for the condition observed.

Mr. Frazier's extreme nervousness was a factor the district court could consider in determining whether the trooper had reasonable suspicion of illegal activity.

[¶ 21]  The district court also found that Mr. Frazier's inconsistent travel plans contributed to the trooper's reasonable suspicion.  "[U]nusual or inconsistent travel plans are a proper consideration in a reasonable suspicion analysis." *Sutton,* ¶ 19, 220 P.3d at 790.  The trooper stated he was suspicious because Mr. Frazier's travel plans seemed implausible.  Mr. Frazier stated that he left Reno last night meaning he would have driven 12–15 hours through the night, according to the trooper's calculation, to reach Laramie County by 8:00 a.m.  Mr. Frazier did not exhibit the kind of fatigue that the trooper would have expected from someone who drove through the night.  Mr. Frazier's story also changed several times.  When Mr. Frazier was answering questions in the patrol car, he told the trooper he learned about his grandfather's illness the night before, however, upon further questioning, he said he had learned about it three days earlier.  Mr. Frazier had a map open to California, yet never mentioned that state in his travel plans.  The trooper testified that the Reno area is a source for controlled substances and typically drugs travel from west to east.  He stated that he "put things together with the nervousness and the totality of the circumstances" and suspected that Mr. Frazier was transporting illegal drugs.

[¶ 22]  These factors—the inconsistent travel plans, odor suppressing agents, the map open to California, and the persistent and extreme nervousness—when viewed individually could be seen as innocent.  As the district court stated:

> Application of the facts developed in the record to the law in this case as in most is fact intensive and nuanced.  It is so to the point that the lay person would see it as "hair-splitting."  Each of the elements that make up the "totality of the circumstances" viewed alone seem[s] tenuous.

The district court considered the trooper's training and experience in determining whether the totality of the circumstances amounted to reasonable suspicion:

> The training and experience of the officer in a case like this includes his general knowledge of conditions.  It has been judicially noticed by the Wyoming Supreme Court that the place of this traffic stop is "... along a nationally recognized drug trafficking corridor." *O'Boyle v. State,* 117 P.3d 401, 411.  In this context, observations by an officer that might not otherwise reasonably be expected to arouse suspicion do so.  The odor-masking agents are a good example.  The Trooper's suspicion was reasonable in the totality of circumstances.

This conclusion is consistent with previous decisions in which we have said that each of the factors considered might be innocent, but under the totality of the circumstances test, individually innocuous factors can combine to arouse a reasonable suspicion for the experienced officer. *Leyva,* ¶ 13, 220 P.3d at 794–95; *Feeney v. State,* 2009 WY 67, ¶ 22, 208 P.3d 50, 57 (Wyo.2009).  We find no error in the district court's conclusion.

## Length of Detention

[¶ 23] Lastly, Mr. Frazier asserts that the fifty-three minute wait for the canine unit to arrive was unreasonable under the Fourth Amendment. "The reasonableness of the detention is to be measured by whether the police acted diligently under all the circumstances of the case and whether the detention involved delay unnecessary to a legitimate police inquiry." *State v. Welch*, 873 P.2d 601, 605 (Wyo.1994). The trooper called for the canine unit immediately after informing Mr. Frazier that he was detained. The canine handler, who responded from his home, lived north of Cheyenne and had to travel a distance of approximately 48 miles to reach the trooper's location. The record does not reflect any delay in requesting or responding to the call for the canine unit and Mr. Frazier suggests none. We have previously found that similar waiting times did not violate the Fourth Amendment. *See id.* at 605 (fifty-minute detention while canine unit was transported approximately 31 miles was reasonable). Mr. Frazier's detention while the canine unit was dispatched to his location was not unreasonable given the totality of the circumstances.

[¶ 24] Affirmed.