# IN THE SUPREME COURT, STATE OF WYOMING

# 2020 WY 151

**OCTOBER TERM, A.D. 2020**

**December 16, 2020**

KELLON CHRISTON PRYCE,

Appellant
(Defendant),

v.

THE STATE OF WYOMING,

Appellee
(Plaintiff).

S-20-0055

*Appeal from the District Court of Laramie County*
*The Honorable Steven K. Sharpe, Judge*

*Representing Appellant:*

Office of the State Public Defender: Diane M. Lozano, Wyoming Public Defender; Kirk A. Morgan, Chief Appellate Counsel; Robin S. Cooper, Senior Assistant Appellate Counsel. Argument by Ms. Cooper.

*Representing Appellee:*

Bridget L. Hill, Wyoming Attorney General; Jenny L. Craig, Deputy Attorney General; Joshua C. Eames, Senior Assistant Attorney General; Donovan Burton, Student Intern. Argument by Mr. Burton.

*Before DAVIS, C.J., and FOX, KAUTZ, BOOMGAARDEN, and GRAY, JJ.*

*BOOMGAARDEN, J., delivers the opinion of the Court; FOX, J., files a dissenting opinion, in which DAVIS, C.J., joins.*

**NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**BOOMGAARDEN, Justice.**

[¶1]    After a jury trial, Kellon Christon Pryce was convicted of two controlled substance charges.  On appeal, he argues the district court erroneously denied his motion to suppress evidence found during a search of the rental van he was driving.  We affirm.

*ISSUE*

[¶2]    Did the district court err when it denied Mr. Pryce's motion to suppress?

*FACTS*

[¶3]    On July 28, 2018, Wyoming Highway Patrol Trooper Joseph Dellos was driving eastbound on Interstate 80 to Cheyenne when he observed the driver of a Dodge van change lanes without signaling.  The trooper could not read the registration sticker on the license plate so he followed the van and radioed dispatch to determine whether the registration was current.  Dispatch informed him the registration expired in April 2018.  He activated the overhead lights on his patrol car, which activated his dash cam video.  The driver pulled onto the shoulder of the interstate without incident.

[¶4]    Trooper Dellos approached the passenger side, and when the passenger rolled down the window, he introduced himself and explained that he stopped the van for failing to signal and expired registration.  He requested the driver's license, vehicle registration, and proof of insurance.  Three people, all adults, were in the van: the male driver, a male passenger in the front seat, and a female passenger in the back seat.  Trooper Dellos identified the driver as Mr. Pryce from his Florida driver's license.  Mr. Pryce said the van was a rental.  Compared to other stops, the trooper noticed that Mr. Pryce appeared "very nervous" and visibly shook as he handed over documents.  He requested Mr. Pryce come back to his patrol car so he could issue a warning citation for the turn signal violation.

[¶5]    Trooper Dellos asked the front passenger for identification as Mr. Pryce walked back to the patrol car.  He also asked the passenger where they were going, and "what for." Jonathan Sooknanan provided his identification and said they were going to Nebraska to visit family.

[¶6]    On meeting Mr. Pryce at the patrol car about 30 seconds later, Trooper Dellos sat in the driver's seat and Mr. Pryce joined him in the front passenger seat.  While writing the warning citation, Trooper Dellos asked Mr. Pryce where he was "headed."  Mr. Pryce said they were "just traveling around."  They had never been on a road trip so they were taking one, and then "the baby got sick" and his girlfriend had to fly out.

[¶7]    Because Mr. Pryce and Mr. Sooknanan gave different answers about where they were going, Trooper Dellos asked more travel plan questions while he continued writing

1

the warning citation.  When he asked Mr. Pryce where they were traveling from, Mr. Pryce answered they had visited family in Salt Lake City, Utah.  When Trooper Dellos asked who Mr. Pryce was traveling with, Mr. Pryce answered his best friend and his best friend's fiancé.

[¶8]    After a pause in the conversation, Trooper Dellos asked whether they were returning to Florida.  Mr. Pryce confirmed they were, but explained that they were going to make a couple stops along the way, depending on the state.  Trooper Dellos asked whether they had any family "out this way" and Mr. Pryce responded "no."  Mr. Pryce volunteered that he wanted to stop in Georgia.  When asked for clarification whether they had any family "out here"—meaning in Nebraska, Wyoming, or Colorado—Mr. Pryce indicated they did not, but he did have a friend in Colorado.

[¶9]    Certain of the inconsistency, Trooper Dellos then asked Mr. Pryce questions about the rental.  He asked who rented the van.  After a pause, Mr. Pryce said that Mr. Sooknanan rented it at an airport.  Seeking clarification, the trooper learned that they flew to Salt Lake City and then drove to the airport in Eugene, Oregon to rent the van because Salt Lake City did not have any rentals due to the forest fires in Utah.  Mr. Pryce did not know how long the drive took because he slept on the way.  Trooper Dellos noted that it seemed "strange" to drive such a long way for a rental car and inquired whether there were any rentals closer.  Mr. Pryce responded there were not.

[¶10]  At this point, approximately 12 minutes into the stop, Trooper Dellos believed he had reasonable suspicion of criminal activity and requested dispatch send a drug dog to his location.  While waiting for the dog, he asked Mr. Pryce when he rented the van, when he flew into Salt Lake City, when and where they were returning the van, where they went after leaving Oregon, and whether they stopped to visit any family or friends along the way.  Mr. Pryce responded that they rented the van on the 25th and they were returning it to Orlando on Sunday, which Trooper Dellos noted was the following day.  Mr. Pryce could not remember where they went after leaving Oregon.  They did not stop to visit any family or friends.

[¶11]  Trooper Dellos then exited his patrol car, returned to the van, and spoke to Mr. Sooknanan for two and a half minutes.  He asked Mr. Sooknanan where they were going, where they came from originally, where they rented the van, whether they stopped anywhere else along the way, who rented the van, whether they all traveled together, and how the group was related.  Contrary to Mr. Pryce, Mr. Sooknanan claimed they all came from Nevada and that they flew to Portland, Oregon to rent the van.

[¶12]  After speaking to Mr. Sooknanan, Trooper Dellos briefly spoke to another trooper who had arrived to assist.  For the next four minutes the troopers together questioned Mr. Pryce about the rental van and his travel plans.  Then Trooper Dellos informed Mr. Pryce there were some "huge inconsistencies" in his and Mr. Sooknanan's stories.  He told Mr.

2

Pryce that he was not under arrest and advised him of his Miranda rights. Mr. Pryce agreed to speak to Trooper Dellos further.

[¶13] The drug dog arrived approximately 25 minutes into the stop, and alerted to the presence of a controlled substance. On searching the van, Trooper Dellos found multiple large duffle bags containing a total of 121 pounds of raw marijuana in vacuum-sealed packages. He also found 415 ounces of THC oil.

[¶14] The State charged Mr. Pryce with four felonies: possession of marijuana, possession of THC oil, possession with intent to deliver marijuana, and possession with intent to deliver THC oil. After pleading not guilty to those offenses, Mr. Pryce moved to suppress the evidence found in the van. The district court held an evidentiary hearing where Trooper Dellos testified. The parties stipulated to in camera review of his dash cam video.

[¶15] The court denied Mr. Pryce's motion to suppress following the hearing, and the case proceeded to trial in September 2019. The jury found Mr. Pryce guilty of the two possession charges, but could not reach a unanimous verdict on the two intent to deliver charges. The district court entered judgment on the jury's verdict. It imposed concurrent sentences of three to five years, suspended in favor of three years of supervised probation. This appeal followed.

## STANDARD OF REVIEW

[¶16] Mr. Pryce challenges denial of his motion to suppress under the Fourth Amendment to the United States Constitution.

> In reviewing a denial of a motion to suppress evidence, we adopt the district court's factual findings unless those findings are clearly erroneous. *Rodriguez v. State*, 2018 WY 134, ¶ 15, 430 P.3d 766, 770 (Wyo. 2018) (citing *Jennings v. State*, 2016 WY 69, ¶ 8, 375 P.3d 788, 790 (Wyo. 2016)). We view the evidence in the light most favorable to the district court's decision because the court conducted the hearing and had the opportunity to "assess the witnesses' credibility, weigh the evidence and make the necessary inferences, deductions and conclusions." *Kunselman v. State*, 2008 WY 85, ¶ 9, 188 P.3d 567, 569 (Wyo. 2008) (quoting *Hembree v. State*, 2006 WY 127 ¶ 7, 143 P.3d 905, 907 (Wyo. 2006)). "On those issues where the district court has not made specific findings of fact, this Court will uphold the general ruling of the court below if supported by any reasonable view of the evidence." *Feeney v. State*, 2009 WY 67, ¶ 9, 208 P.3d 50, 53 (Wyo. 2009) (citing *Neilson v. State*, 599 P.2d 1326, 1330 (Wyo. 1979)). "The

ultimate question of whether the search or seizure was legally justified, however, is a question of law we review de novo." *Rodriguez*, ¶ 15, 430 P.3d at 770.

*Brown v. State*, 2019 WY 42, ¶ 10, 439 P.3d 726, 730 (Wyo. 2019). Mr. Pryce does not challenge the district court's factual findings. Consequently, our discussion focuses on the legal issues. *See Feeney*, ¶ 15, 208 P.3d at 55.

## DISCUSSION

[¶17] The Fourth Amendment to the United States Constitution protects Mr. Pryce from "unreasonable searches and seizures." U.S. Const. amend. IV. "Fourth Amendment jurisprudence recognizes three tiers of interaction between law enforcement and citizens: consensual encounter, investigatory detention and arrest." *Robinson v. State*, 2019 WY 125, ¶ 21, 454 P.3d 149, 156 (Wyo. 2019) (citation omitted). The interaction between Mr. Pryce and Trooper Dellos began as a traffic stop, which is an investigatory detention. *Id.* (citation omitted).

[¶18] We evaluate the reasonableness of an investigatory stop under the Fourth Amendment by using the two-part inquiry from *Terry v. Ohio*, 392 U.S. 1, 19–20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968): "(1) whether the initial stop was justified; and (2) whether the officer's actions during the detention were reasonably related in scope to the circumstances that justified the interference in the first instance." *Brown*, ¶ 19, 439 P.3d at 732 (citation omitted). "An officer's conduct is judged by an objective standard taking into account the totality of the circumstances." *Id.* (citation omitted). "[W]hile the test is objective, the officer's training, experience, and expertise are to be considered as part of the 'totality of the circumstances.'" *Id.* (citation omitted).

[¶19] Mr. Pryce does not take issue with the initial stop. Instead, he generally argues "that law enforcement violated his Fourth Amendment right against unreasonable search and seizure when they detained him for the purpose of having a [dog] unit arrive on scene after they had already gathered all the information they needed to issue a warning." He contends Trooper Dellos' travel plan inquiry—directed both at him and Mr. Sooknanan—was unreasonable because the questions did not pertain to the purpose of the stop, and thus were unreasonable in scope and duration. He also suggests that Trooper Dellos did not have reasonable suspicion to extend the detention for the dog sniff and instead asked numerous unrelated questions about travel plans in a misguided attempt to accomplish the dog sniff within the time of the original detention.

[¶20] In challenging the travel plan inquiry, Mr. Pryce does not parse out the questions posed to Mr. Sooknanan from those Trooper Dellos posed to him. Nor does he distinguish those questions Trooper Dellos asked before developing reasonable suspicion from questions he asked after developing reasonable suspicion. These distinctions are important,

4

however, to correctly evaluate the totality of circumstances and how they developed. On considering the questions and circumstances specifically relevant to each stage of the encounter, we conclude Trooper Dellos' "initial" travel plan questions—meaning those he asked Mr. Sooknanan and Mr. Pryce before he had reasonable suspicion of other criminal activity and requested a drug dog—were reasonable under the totality of the circumstances. *See Klomliam v. State*, 2014 WY 1, ¶¶ 25–26, 28–30, 315 P.3d 665, 672–73 (Wyo. 2014) (distinguishing between questions the officer asked before and after developing reasonable suspicion). We further conclude Trooper Dellos developed reasonable suspicion of other criminal activity approximately 12 minutes into the stop, thus justifying an extended detention for the dog sniff as well as the troopers' more expansive questioning of Mr. Pryce and Mr. Sooknanan. The dog alert then provided probable cause to search the van.

### A. The Initial Detention and Inquiry

[¶21] "An investigative detention must be temporary, lasting no longer than necessary to effectuate the purpose of the stop, and the scope of the detention must be carefully tailored to its underlying justification." *Brown*, ¶ 20, 439 P.3d at 732 (citation omitted). "During a routine traffic stop, an officer may request a driver's license, proof of insurance, and vehicle registration, run a computer check, and issue a citation or warning." *Id.* (citation omitted).

[¶22] Travel plans also are an "acceptable area of limited inquiry during a routine traffic stop." *Klomliam*, ¶ 23, 315 P.3d at 671 (quoting *Frazier v. State*, 2010 WY 107, ¶ 12, 236 P.3d 295, 299 (Wyo. 2010)); *see also Ray v. State*, 2018 WY 146, ¶ 19, 432 P.3d 872, 877 (Wyo. 2018) (citing *O'Boyle v. State*, 2005 WY 83, ¶ 48, 117 P.3d 401, 414 (Wyo. 2005)) ("Inquiry into travel plans is also permitted to put the traffic violation in context."); *Negrette v. State*, 2007 WY 88, ¶ 21, 158 P.3d 679, 684 (Wyo. 2007) (citation omitted) ("[A]n officer may make reasonable inquiry into travel plans to the extent necessary to put the traffic violation in context."). "However, extensive and prolonged inquiry into the details of a detained driver's travel plans may be unreasonable." *Klomliam*, ¶ 23, 315 P.3d at 671 (quoting *Lovato v. State*, 2010 WY 38, ¶ 27, 228 P.3d 55, 61 (Wyo. 2010)); *see, e.g., O'Boyle*, ¶¶ 56–59, 117 P.3d at 416–17 (concluding the trooper's "extensive questioning" of the driver inside the patrol car about not only his "travel plans and the rental car, but questions far removed from either his travel plans or the speeding violation," was unreasonable and unconstitutional under the Fourth Amendment). "The rule 'is one of reasonableness under the totality of the circumstances.'" *Klomliam*, ¶ 23, 315 P.3d at 671 (quoting *Lovato*, ¶ 27, 228 P.3d at 61).

[¶23] We turn to Mr. Pryce's argument with these rules in mind. According to Mr. Pryce, the travel plan questions Trooper Dellos asked him and Mr. Sooknanan did not pertain to the traffic stop's purpose and unreasonably prolonged the stop because Trooper Dellos admitted at the motion to suppress hearing that he had all the information he needed to issue the warning citation. Established caselaw refutes this argument.

5

[¶24]   In *Frazier*, for example, a trooper initiated a traffic stop because a license plate bracket blocked his view of the state name on the rear license plate of Mr. Frazier's vehicle. ¶ 3, 236 P.3d at 297.  When the trooper initially approached the vehicle, he informed Mr. Frazier of the reason for the stop and briefly asked about his travel plans.  *Id.* ¶¶ 3–4, 12, 236 P.3d at 297, 299.  Mr. Frazier joined him in the patrol car, where the trooper asked him where he had been on his road trip, how long he had been in Reno, and how long he had lived in Tennessee.  *Id.* ¶ 12, 236 P.3d at 299.  Mr. Frazier answered these questions and volunteered information about his sick grandfather.  *Id.*  The trooper followed up with two questions about the seriousness of the grandfather's condition.  *Id.*

[¶25]   On appeal, Mr. Frazier "suggest[ed] that the trooper's questions, as he wrote out the traffic warning, were unreasonable because they were unrelated to the purpose of the stop." *Id.* ¶ 10, 236 P.3d at 299.  We disagreed, stating that "[a]lthough these questions may not have been directly related to the obstructed license plate, the scope of the inquiry was not unreasonable under the circumstances."  *Id.* ¶ 12, 236 P.3d at 299.  The trooper did not ask Mr. Frazier about illegal substances.  *Id.*  The questioning did not unreasonably delay the stop, as he returned the license and registration, along with the written warning, four minutes after entering the patrol car.  *Id.*  Considered in light of all the surrounding circumstances, we concluded that the trooper's few questions relating to travel plans were not unreasonable.  *Id.*

[¶26]   In *Klomliam*, Corporal Parker pulled a vehicle over for speeding.  ¶¶ 3–4, 315 P.3d at 666.[1]  On approaching the passenger window, he introduced himself and informed Ms. Klomliam that he stopped her for speeding.  *Id.* ¶ 5, 315 P.3d at 666.  He asked for her driver's license, vehicle registration, and proof of insurance.  *Id.*  He also asked who owned the vehicle.  *Id.*  While she searched for the requested documents, Corporal Parker asked her and her adult passenger where they were traveling from.  *Id.*  Both responded, with Ms. Klomliam stating they were traveling from Washington and the passenger stating they were traveling from Indiana.  *Id.*  They clarified that they left Indiana on November 3, traveled to Washington, and were on their return trip to Indiana.  *Id.*  Corporal Parker asked additional questions about Ms. Klomliam's travel plans, including what she was doing in Washington and whether they were planning to drive through the entire night.  *Id.*

[¶27]   Approximately two and a half minutes into the stop, Ms. Klomliam handed Corporal Parker her driver's license and the vehicle's bill of sale.  *Id.*  While Ms. Klomliam continued searching for her registration and proof of insurance, Corporal Parker asked additional questions about their travel, including how far they intended to travel that evening, when they left Indiana to travel to Washington, and why their trip involved such

---

[1] We decided *Klomliam* under art. 1, § 4 of the Wyoming Constitution, but noted "there is not a significant difference between our federal and state analysis, given that under either analysis we are considering the reasonableness of the government intrusion in light of all the circumstances."  *Klomliam*, ¶ 17 n.1, 315 P.3d at 669 n.1 (citations omitted).  *Klomliam* therefore soundly applies to our Fourth Amendment analysis.

a quick turnaround. *Id.* ¶ 6, 315 P.3d at 666. Ms. Klomliam responded that they left Indiana on Thursday, November 3rd, drove to Washington to visit family, and left Washington that morning, November 6th, to return to Indiana. *Id.* Shortly after this initial contact with Ms. Klomliam, Corporal Parker told her to continue looking for her registration and proof of insurance and returned to his patrol car with the documents she had provided him. *Id.*

[¶28]  We concluded the scope of Corporal Parker's initial questioning was reasonable. *Id.* ¶ 25, 315 P.3d at 672. We explained that "[t]he questions at this point were few in number, and given that [Ms.] Klomliam and her adult passenger gave inconsistent answers when initially asked where they were traveling from, we would expect that a law enforcement officer would follow up on the inconsistency." *Id.* We further concluded the questions did not unreasonably prolong the stop. *Id.* ¶ 26, 315 P.3d at 672. Corporal Parker asked the follow-up questions about Ms. Klomliam's travel plans as she searched for her registration and proof of insurance. *Id.*

[¶29]  The Tenth Circuit Court of Appeals recently addressed a traffic stop where, as here, a law enforcement officer asked travel plan questions of both the driver and a passenger early in the stop. *United States v. Cortez*, 965 F.3d 827, 831 (10th Cir. 2020). Concluding the initial travel plan questions were permissible under the Fourth Amendment, the Court explained:

> Sergeant Alvarez was similarly entitled to inquire as to Cortez[, the driver,] and Reyes-Moreno's[, the passenger's,] travel plans. *United States v. Moore*, 795 F.3d 1224, 1229 (10th Cir. 2015) (holding "[a]n officer may . . . generally inquire about the driver's travel plans" without violating the Fourth Amendment). As we explained in *United States v. Holt*, such inquiries are justified because "[t]ravel plans typically are related to the purpose of a traffic stop." 264 F.3d 1215, 1221 (10th Cir. 2001) (en banc), *overturned on other grounds by Muehler v. Mena*, 544 U.S. 93, 125 S.Ct. 1465, 161 L.Ed.2d 299 (2005).
>
> Sergeant Alvarez's questions regarding where Cortez and Reyes-Moreno were coming from, where they were going, and how long they had stayed in Douglas are permissible as they fit into the travel plans rubric and relate to the mission of the stop. *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1259 (10th Cir. 2006) ("[A]n officer may routinely ask about travel plans . . . during a lawful traffic stop."). These questions could cast light on why Cortez had been speeding, tying them to the initial justification for the stop. *Holt*, 264 F.3d at 1221 (explaining that such inquiries "may help explain, or put into

context, why the motorist was weaving (if tired) or speeding (if there was an urgency to the travel)").

*Id.* at 839.

[¶30]  Trooper Dellos was similarly entitled to ask Mr. Sooknanan and Mr. Pryce about their travel plans to put the traffic violation and mission of the stop in context.  The nature of the group's plans could shed light on whether faulty equipment or driver fatigue might explain Mr. Pryce's failure to signal.  *See Ray*, ¶ 19, 432 P.3d at 877; *Negrette*, ¶¶ 21–23, 158 P.3d at 684–85; *Cortez*, 965 F.3d at 839.  Trooper Dellos also understood at the time that the vehicle's registration had expired.[2]  The group's travel plans might have explained why Mr. Pryce was driving with an expired tag.  *See Ray*, ¶ 19, 432 P.3d at 877; *Negrette*, ¶¶ 21–23, 158 P.3d at 684–85; *Cortez*, 965 F.3d at 839.

[¶31]  Trooper Dellos' initial questions were reasonable in scope.  The dash cam video shows that Trooper Dellos first asked Mr. Sooknanan for identification—a patently permissible question under Fourth Amendment precedent.  *See, e.g.*, *Cortez*, 965 F.3d at 838–39 (collecting cases about identifying passengers).  Then he asked Mr. Sooknanan a limited number of questions pertaining to where the group was traveling and for what purpose.  Mr. Sooknanan stated they were driving to Nebraska to visit family.

[¶32]  On entering the patrol car, Trooper Dellos asked Mr. Pryce one travel plan question—where he was "headed."  Mr. Pryce responded they were "just traveling around," adding that they had never been on a road trip so they were taking one, and then "the baby got sick" and his girlfriend had to fly out.  As in *Klomliam*, the driver and his adult passenger gave inconsistent answers when asked straightforward questions about their destination shortly into the stop.  *See* ¶¶ 5, 25, 315 P.3d at 666, 672.  Trooper Dellos then followed up with the types of questions we would expect a law enforcement officer to ask under such circumstances.  *See id.* ¶ 25, 315 P.3d at 672.  He sought clarification as to where the group had been and where they were going.  On confirming the inconsistent destinations, he asked where they had rented the van.  Each of Mr. Pryce's answers warranted further follow up and some were implausible, thus contributing to the trooper's reasonable suspicion.  *See Brown*, ¶¶ 19, 23, 439 P.3d at 732–33 (noting our deference to an officer's training, experience, expertise, and "ability to distinguish between innocence and suspicious actions").

[¶33]  Trooper Dellos' initial travel plan questions also were reasonable in duration; they did not unreasonably prolong the stop.  The entire exchange between Trooper Dellos and Mr. Sooknanan, some of which occurred as Mr. Pryce was walking back to the patrol car, lasted approximately 30 seconds.  *See Cortez*, 965 F.3d at 837–38 (citations omitted) ("Although it is appropriate to consider police diligence . . . the mere fact that an officer

---

[2] Trooper Dellos learned the registration was not expired after the stop and search had been completed.

8

could, conceivably, have performed a task more quickly than he did fails, on its own, to generate a Fourth Amendment violation."). And, the exchange between Trooper Dellos and Mr. Pryce occurred as the trooper filled out the warning citation. *See Klomliam*, ¶ 26, 315 P.3d at 672; *see also Ray*, ¶ 20, 432 P.3d at 878. At the motion to suppress hearing, he estimated that an average traffic stop took him about 8 to 13 minutes. Trooper Dellos developed reasonable suspicion within that time, approximately 12 minutes into the stop.

[¶34] Because the Fourth Amendment permitted Trooper Dellos to ask travel plan questions of Mr. Sooknanan and Mr. Pryce to place the traffic stop in context, and because his questions were reasonable in both scope and duration, we turn to the next stage of his encounter with Mr. Pryce.

### B. The Extended Detention and Expanded Inquiry

[¶35] Less than 15 minutes lapsed from the time Trooper Dellos requested the dog until it arrived. During that time, Trooper Dellos asked Mr. Pryce and Mr. Sooknanan more travel plan questions. Mr. Pryce suggests the trooper asked these questions in an attempt to accomplish the dog sniff within the time of the original detention. We disagree. The record is clear that Trooper Dellos extended the duration of the stop to allow for the dog sniff. The law is clear that he needed reasonable suspicion of other illegal activity to do so. *See Pier v. State*, 2019 WY 3, ¶ 31, 432 P.3d 890, 899 (Wyo. 2019); *Rodriguez v. United States*, 575 U.S. 348, 135 S.Ct. 1609, 191 L.Ed.2d 492 (2015).

[¶36] "A dog sniff of the exterior of a vehicle is not a search under the Fourth Amendment." *Pier*, ¶ 31, 432 P.3d at 899 (citations omitted). "Thus, use of a drug dog does not have to be justified by probable cause or even by reasonable suspicion." *Id.* (citation omitted). "However, when the dog sniff cannot be accomplished within the time of the original detention, the officer must have reasonable suspicion of other illegal activity to extend the duration of the stop to allow for the dog sniff." *Id.* (citation omitted); *see also Rodriguez*, 575 U.S. 348, 135 S.Ct. 1609, 191 L.Ed.2d 492.

[¶37] "Reasonable suspicion accrues when an officer possesses a 'particularized and objective basis for suspecting criminal conduct under a totality of the circumstances.'" *Cortez*, 956 F.3d at 834 (citation omitted). "This is not an onerous standard." *Id.* (citing *United States v. Kitchell*, 653 F.3d 1206, 1219 (10th Cir. 2011)). "Although the government bears the burden of demonstrating the reasonableness of the suspicion, it requires 'considerably less' than a preponderance of the evidence and 'obviously less' than probable cause." *Id.* (citation omitted).

[¶38] In determining whether Trooper Dellos had reasonable suspicion to further detain Mr. Pryce to accomplish a dog sniff "we look to the totality of the circumstances and how those circumstances developed" during Trooper Dellos' encounter with him. *Brown*, ¶ 23, 439 P.3d at 733 (citation omitted). "We do not examine each circumstance individually,

9

but instead 'we evaluate how convincingly they fit together into a cohesive, convincing picture of illegal conduct.'" *Id.* (citation omitted). "Reasonable suspicion may exist even if 'each observation' is 'susceptible to an innocent explanation.'" *Id.* (citation omitted). "In considering the totality of the circumstances, '[c]ommon sense and ordinary human experience are to be employed, and deference is to be accorded a law enforcement officer's ability to distinguish between innocent and suspicious actions.'" *Id.* (citation omitted).

[¶39]  Here, Mr. Pryce's and Mr. Sooknanan's inconsistent travel plan answers contributed greatly to the development of Trooper Dellos' reasonable suspicion. *See Feeney*, ¶ 20, 208 P.3d at 56 (citing *Flood v. State*, 2007 WY 167, ¶¶ 30, 33, 169 P.3d 538, 547–48 (Wyo. 2007)); *see also United States v. Wood*, 106 F.3d 942, 946–47 (10th Cir. 1997) (noting "unusual travel plans may provide an indicia of reasonable suspicion"); *United States v. Mendez*, 118 F.3d 1426, 1431 (10th Cir. 1997) (noting "contradictory or implausible travel plans can contribute to a reasonable suspicion of illegal activity"). In stark contrast to Mr. Sooknanan, who stated they were driving "to Nebraska to visit family," Mr. Pryce indicated "they were headed back to Florida without stopping anywhere else." In trying to discern whether the answers really were inconsistent, Trooper Dellos confirmed with Mr. Pryce that the group did not have family in Nebraska, Wyoming, or Colorado. This placed Mr. Pryce's answer about the group's destination squarely at odds with Mr. Sooknanan's.

[¶40]  Mr. Pryce's "continued nervousness" further contributed to Trooper Dellos' reasonable suspicion. We have recognized that "generic nervousness is of little significance in establishing reasonable suspicion because 'the average citizen is usually nervous when stopped by law enforcement for a routine traffic violation.'" *Feeney*, ¶ 18, 208 P.3d at 55 (citation omitted). The more "telling information is whether the citizen calmed after the initial few minutes of the encounter." *Id.* (citation omitted). To that end, "[e]xtreme and continued nervousness . . . 'is entitled to somewhat more weight.'" *Id.* (citation omitted); *see also Seymour v. State*, 2008 WY 61, ¶ 26, 185 P.3d 671, 678 (Wyo. 2008) ("Abnormal or continuous nervousness may be considered along with other factors in determining whether a law enforcement officer had reasonable suspicion to detain a motorist.").

[¶41]  "Trooper Dellos noted [Mr. Pryce] appeared nervous and his hands were shaking" at the beginning of the traffic stop. This initial nervousness is of little significance. The more telling fact is that Mr. Pryce's nervousness continued, even after Trooper Dellos informed him he would only receive a warning citation for the lane use violation. At the motion to suppress hearing, Trooper Dellos testified that "[t]here was still quite a bit of nervousness in [Mr. Pryce's] behavior" when he spoke to him in the patrol car. Though Mr. Pryce's nervousness may not have been "extreme," Trooper Dellos could weigh his "continued nervousness" together with the inconsistent travel plans. *See Seymour*, ¶ 26, 185 P.3d at 678.

[¶42]  On considering the totality of the circumstances—which included not only inconsistent travel plan answers and Mr. Pryce's continued nervousness, but also Mr. Pryce's far-fetched assertion that there were no rental vehicles anywhere closer to Salt Lake City than Oregon—we conclude that Trooper Dellos had reasonable suspicion of other criminal activity when he requested dispatch send a drug dog to his location.  Reasonable suspicion justified extending the stop for the dog sniff.[3]  *See Pier*, ¶ 31, 432 P.3d at 899.  It also justified the expanded scope of questioning of Mr. Pryce and Mr. Sooknanan while waiting for the dog to arrive.  *See Klomliam*, ¶¶ 23, 29–32, 315 P.3d at 671–73.  Mr. Pryce moreover agreed to answer further questions after Trooper Dellos told him that he was not under arrest but advised him of his Miranda rights.

[¶43]  Because Trooper Dellos did not violate Mr. Pryce's Fourth Amendment rights when he requested and then waited for the drug dog to arrive, we turn to the final stage of his encounter with Mr. Pryce: search of the van.

### C. The Search

[¶44]  "The automobile exception to the warrant requirement allows law enforcement to search an automobile without a warrant if there is probable cause to believe the vehicle contains contraband or evidence of a crime."  *Pier*, ¶ 32, 432 P.3d at 899 (citation omitted).  "Under the United States Constitution, when a trained and reliable drug dog alerts during an exterior sniff of a vehicle, there is probable cause to search that vehicle."  *Id.* (citation omitted).  Mr. Pryce does not challenge the dog's training or reliability.  When the dog alerted, Trooper Dellos had probable cause to search the van for drugs.

### *CONCLUSION*

[¶45]  The district court did not err when it denied Mr. Pryce's motion to suppress because law enforcement did not violate his constitutional rights under the Fourth Amendment.

[¶46]  Affirmed.

---

[3] Mr. Pryce does not challenge the amount of time it took for the dog to arrive as unreasonable.  *See, e.g.*, *Frazier*, ¶ 23, 236 P.3d at 303 (concluding a 53-minute wait for the drug dog to arrive was reasonable under the totality of circumstances).

**FOX, Justice,** dissenting, in which **DAVIS, Chief Justice,** joins.

[¶47]   I respectfully dissent.  Binding precedent requires us to apply several presumptions that erode Fourth Amendment protection.  A pretextual stop is no longer a pretextual stop so long as the officer can articulate an objective basis for it.  *Whren v. United States*, 517 U.S. 806, 813, 116 S.Ct. 1769, 1774, 135 L.Ed.2d 89 (1996); *Pier v. State*, 2019 WY 3, ¶ 18, 432 P.3d 890, 896 (Wyo. 2019).  We must therefore disregard that Mr. Pryce is an African American, driving a rented van with out-of-state license plates.  Inquiries into travel plans are acceptable if they put the stop in "context."  *United States v. Cortez*, 965 F.3d 827, 839 (10th Cir. 2020); *Ray v. State*, 2018 WY 146, ¶ 19, 432 P.3d 872, 877 (Wyo. 2018).  We therefore accept the explanation that the failure to signal a lane change could be related to travel plans because it might explain driver fatigue or bear on the concern that the turn signal equipment could fail before the driver reaches his destination.  We even extend our precedent to allow irrelevant inquiries of passengers and must therefore disregard the obvious reason for separately asking the passenger about travel plans—to set up inconsistent stories and build reasonable suspicion.  *Arizona v. Johnson*, 555 U.S. 323, 327, 129 S.Ct. 781, 784, 172 L.Ed.2d 694 (2009); *Kennison v. State*, 2018 WY 46, ¶ 13, 417 P.3d 146, 149-50 (Wyo. 2018).  We have, however, regularly cited the rule that an investigative detention must last "no longer than necessary to effectuate the purpose of the stop, and the scope of the detention must be carefully tailored to its underlying justification."  *E.g., Mills v. State*, 2020 WY 14, ¶ 24, 458 P.3d 1, 10 (Wyo. 2020); *Robinson v. State*, 2019 WY 125, ¶ 31, 454 P.3d 149, 158 (Wyo. 2019); *Brown v. State*, 2019 WY 42, ¶ 20, 439 P.3d 726, 732 (Wyo. 2019); *Dixon v. State*, 2019 WY 37, ¶ 19, 438 P.3d 216, 227 (Wyo. 2019); *Pier*, 2019 WY 3, ¶ 19, 432 P.3d at 897.  The majority also cites to this rule, but does not apply it to the facts of this case.

[¶48]   Trooper Dellos stopped Mr. Pryce for failing to indicate a lane change.  He asked Mr. Pryce for his license and registration and told him to come back to the car so he could give him a warning citation for the lane-use violation.  Trooper Dellos testified that once he had Mr. Pryce's license and rental car information, he had everything he needed for the turn signal violation and did not need to investigate further.  Nevertheless, after asking Mr. Pryce to exit the vehicle, Trooper Dellos leaned in to ask the passenger about the group's travel plans.  While he asked the unrelated questions of the passenger, Mr. Pryce waited by the patrol vehicle for Trooper Dellos to resume the mission of the stop.  The thirty-second extension of the stop was admittedly *de minimis*, but the United States Supreme Court has soundly rejected the argument that a *de minimis* extension of a stop is acceptable.  *Rodriguez v. United States*, 575 U.S. 348, 350-53, 135 S.Ct. 1609, 1612-13, 191 L.Ed.2d 492 (2015) (rejecting lower court's holding that dog sniff, which extended traffic stop seven or eight minutes, was a *de minimis* intrusion that did not violate Fourth Amendment, and holding a "police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures").

[¶49] Courts across the country adjusted their Fourth Amendment jurisprudence in response to *Rodriguez*. *United States v. Stewart*, 902 F.3d 664, 674 (7th Cir. 2018) (seventy-five second extension could unlawfully prolong stop if the purpose of back-up call was to investigate other crimes); *United States v. Clark*, 902 F.3d 404, 410-11 (3rd Cir. 2018) (there is no *de minimis* exception to the *Rodriguez* rule; officer's twenty-second inquiry into the defendant's criminal history impermissibly prolonged the stop); *United States v. Bowman*, 884 F.3d 200, 219 (4th Cir. 2018) (recognized that *Rodriguez* prohibits even a *de minimis* extension and officer's questioning of passenger unreasonably prolonged the traffic stop); *United States v. Gomez*, 877 F.3d 76, 90-91 (2nd Cir. 2017) (officer's unrelated inquiries unlawfully prolonged the traffic stop even though the entire stop lasted around five minutes); *United States v. Gorman*, 859 F.3d 706, 715 (9th Cir. 2017) (unrelated questions unlawfully prolonged traffic stop); *State v. Jimenez*, 420 P.3d 464, 474 (Kan. 2018) (no *de minimis* exception exists and an extension for any length of time is unreasonable under the Fourth Amendment when it is based on anything but the articulated reason for the stop); *Presley v. State*, 227 So.3d 95, 106 (Fla. 2017) (officers can detain passengers only for the reasonable length of the traffic stop); *Davis v. Commonwealth*, 484 S.W.3d 288, 294 (Ky. 2016) ("*any* prolonging of the stop beyond its original purpose is unreasonable and unjustified; there is no '*de minimis* exception'" (emphasis in original)); *State v. Linze*, 389 P.3d 150, 154 (Idaho 2016) (officer unlawfully prolonged the stop two and a half minutes when he provided back-up for an officer performing a drug dog sweep).

[¶50] The Wyoming cases the majority relies on are not to the contrary,[4] because they address only the scope of the questioning and not their duration. In *Frazier*, the trooper pulled Mr. Frazier over and had him sit in the patrol car while the trooper wrote a warning. *Frazier v. State*, 2010 WY 107, ¶ 5, 236 P.3d 295, 297 (Wyo. 2010). "While waiting for dispatch to report on the driver's license," a permissible function in a traffic stop, "the trooper asked Mr. Frazier about his travel plans." *Id.* The trooper then returned Mr. Frazier's license and registration and, while Mr. Frazier was walking back to his vehicle, asked him if he could ask a few more questions. Mr. Frazier agreed. *Id.* at ¶ 6, 236 P.3d at 298. The issue in *Frazier* was whether "the trooper's questions, as he wrote out the traffic warning, were unreasonable because they were unrelated to the purpose of the stop." *Id.* at ¶ 10, 236 P.3d at 299. Mr. Frazier did "not take serious issue with the length of the initial stop." *Id.* The disputed questions were asked while the trooper was fulfilling the legitimate functions of the stop, they did not prolong the stop, and the case did not address the length of the stop.

[¶51] Similarly, in *Klomliam*, Corporal Parker stopped Ms. Klomliam for speeding and asked for her license, registration, and proof of insurance. *Klomliam v. State*, 2014 WY 1, ¶ 5, 315 P.3d 665, 666 (Wyo. 2014). She promptly provided her license, but continued to

---

[4] If they were, they would have to yield to federal law interpreting the United States Constitution. This case was brought solely under the Fourth Amendment and, thus, United States Supreme Court precedent is controlling. Wyo. Const. art. 1, § 37.

search for her vehicle registration and proof of insurance. "While [Ms.] Klomliam continued to search for her vehicle registration and proof of insurance, Corporal Parker asked additional questions . . . ." *Id.* at ¶ 6, 315 P.3d at 666. He then returned to his patrol car and spent nine additional minutes completing activities that were within the scope of the traffic stop. *Id.* at ¶ 27, 315 P.3d at 672. The Court concluded that Corporal Parker's questions did not "unreasonably prolong[] the stop," because they "were asked while [Ms.] Klomliam was searching for her vehicle registration and proof of insurance." *Id.* at ¶ 26, 315 P.3d at 672.[5] Unlike in *Klomliam* and *Frazier*, Trooper Dellos' detour to question the passenger about travel plans, while Mr. Pryce waited for him to proceed with issuing the warning, did unreasonably prolong the stop.

[¶52] These cases, when read in harmony with the United States Supreme Court's guidance in *Rodriguez*, illustrate the important limitation on the majority's statement that travel plans are an "acceptable area of limited inquiry during a routine traffic stop." "[G]iven the Supreme Court's *Rodriguez* decision, . . . the contention 'that unrestrained travel plan questioning is routine and always within a traffic stop's mission' must be rejected out of hand, and . . . instead courts must inquire whether, on the facts of the particular case, such questioning is within the traffic stop's mission." 4 Wayne R. LaFave, *Search and Seizure* § 9.3(d) Investigative techniques: questioning vehicle occupants (6th ed.), Westlaw (database updated September 2020). "Because addressing the infraction is the purpose of the stop, it may 'last no longer than is necessary to effectuate that purpose.'" *Rodriguez*, 575 U.S. at 354, 135 S.Ct. at 1614 (alteration omitted); *see also Brown*, 2019 WY 42, ¶ 20, 439 P.3d at 732 (driver may only be detained for the time necessary to "request a driver's license, proof of insurance, and vehicle registration, run a computer check, and issue a citation or warning"). Travel plan questioning is not on the list of necessary tasks. An officer may ask travel questions during an otherwise lawful stop, but "he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Rodriguez*, 575 U.S. at 355, 135 S.Ct. at 1615; *see also United States v. Gomez-Arzate*, No. 19-2119, 2020 WL 7053307, at *5 n.3 (10th Cir. Dec. 2, 2020) (recognizing that travel plan questions may fall into scope of traffic stop, but not when questions prolong the stop); *Jimenez*, 420 P.3d at 474-76 (determining that, under *Rodriguez*, travel plan questioning is only permissible if it does not extend the stop and requires a case-by-case evaluation). Any legitimate basis for inquiring about travel plans was satisfied when Trooper Dellos asked Mr. Pryce those questions while he was writing the citation.

[¶53] Trooper Dellos' thirty-second detour to question the passenger prolonged the stop, it was outside the purpose of the traffic stop and, thus, unlawful. When an officer unlawfully extends a stop in violation of the Fourth Amendment, the remedy is suppression

---

[5] *Klomliam*'s analysis is of dubious relevance to the Fourth Amendment issue because it was decided under Article 1, § 4 of the Wyoming Constitution and not the United States Constitution. *Id.* at ¶ 2, 315 P.3d at 666.

of the evidence discovered. *Campbell v. State*, 2004 WY 106, ¶ 21, 97 P.3d 781, 787 (Wyo. 2004).

[¶54] For these reasons, I would reverse the district court and order the evidence suppressed.